906 A.2d 969

Darris Alaric WARE

v.

STATE of Maryland.

No. 2103, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Sept. 7, 2006.

**4**

John Marston (Donald P. Salzman, Albert H. Turkus, on brief), Washington, DC, for appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel HOLLANDER, DEBORAH S. EYLER, MEREDITH, JJ.

HOLLANDER, J.

This protracted litigation arises from the brutal murders of two young women in 1993. In 1995, Darris Ware, appellant, was convicted in the Circuit Court for Howard County (Sweeney, J.), on two counts of first-degree murder, for which he was sentenced to death. That conviction was reversed by the Court of Appeals, which determined that the State had unlawfully suppressed material evidence favorable to Ware. *See Ware v. State*, 348 Md. 19, 52, 702 A.2d 699 (1997) (*"Ware I "*). Ware was re-tried in 1999 in the Circuit Court for Anne Arundel County (Thieme, J.), and was again convicted and

sentenced to death. That conviction was affirmed. *See Ware v. State*, 360 Md. 650, 759 A.2d 764 (2000), *cert. denied*, 531 U.S. 1115, 121 S.Ct. 864, 148 L.Ed.2d 776 (2001) (*"Ware II "*).

Thereafter, appellant filed a petition for post-conviction relief in April of 2002. The Circuit Court for Anne Arundel County (Heller, J.) granted the petition, in part, on June 28, 2002 (*"Ware III "*). It found that, for two reasons, appellant received ineffective assistance of counsel in *Ware II.*

First, the *Ware III* Court determined that Ware's appellate attorney failed to argue that the trial court erred in allowing the prosecution to introduce evidence of appellant's post-*Miranda* silence. As to that issue, the circuit court granted appellant a "belated appeal." Second, the *Ware III* Court found that Ware received ineffective assistance of trial counsel during the 1999 sentencing proceeding, because his defense attorney was not adequately prepared. Therefore, it granted Ware a new sentencing.

The Court of Appeals subsequently denied the parties' cross applications for leave to appeal. *State v. Ware*, 373 Md. 550, 819 A.2d 1030 (2002) (*"Ware IV "*). Of import here, the *Ware IV* Court ordered, *id.* at 550–51, 819 A.2d 1030,

> that, as to the belated appeal ordered by the Circuit Court on the single issue of whether Darris Ware had received ineffective assistance of appellate counsel, consideration of that appeal is deferred pending the new sentencing proceeding, and the belated appeal will be considered with the appeal, if any, from the decision in the sentencing hearing.

On October 14, 2004, the circuit court (Manck, J.) held a new sentencing hearing, at which the State withdrew its intent to seek the death penalty and instead sought a sentence of life imprisonment, without parole. However, the court did not obtain a new pre-sentence investigation ("PSI"). Instead, at the sentencing on October 14, 2004, the court had the two earlier PSI reports, from 1995 and 1999, and imposed a sentence of life without parole.

This appeal followed, in which appellant raises the *Miranda* issue permitted by Judge Heller by way of a belated appeal,

and challenges Judge Manck's sentence. The State challenges Judge Heller's ruling permitting the belated appeal of the *Miranda* issue.

Ware poses the following two issues:

I. Whether the trial court erred, under the United States Constitution and the Maryland Declaration of Rights, by allowing the prosecution to introduce and emphasize evidence of post-*Miranda* silence[.]

II. Whether the trial court's error in allowing the prosecution to introduce and emphasize evidence of post-*Miranda* silence was not harmless beyond a reasonable doubt when the prosecution used that silence as evidence of guilt and to fill a significant evidentiary gap in the State's case, and when the other evidence presented by the [S]tate was circumstantial and the State's key witness was substantially impeached[.]

III. Whether the sentencing court committed plain error by failing to order and consider an updated PSI report, but instead relied upon two previous PSI reports which excluded five years of Mr. Ware's history [during his incarceration.]

The State asks:

1. To the extent preserved, did the trial court properly exercise discretion in admitting the testimony of Detective Michael Praley regarding his post-arrest interview with Ware?

For the reasons that follow, we shall affirm.

## FACTUAL AND PROCEDURAL SUMMARY

On September 11, 1995, appellant was found guilty of two counts of first-degree murder and two counts of the use of a handgun in the commission of the murders, for which he was sentenced to death. *See Ware I,* 348 Md. at 28, 702 A.2d 699. However, the Court of Appeals reversed those convictions. *See Ware I.* Consequently, Ware was retried and again convicted in 1999; the Court of Appeals affirmed. *Ware II,* 360

Md. 650, 759 A.2d 764. Thereafter, appellant brought the post-conviction proceeding that led to this appeal. As the appeal is based on the 1999 trial (*Ware II*), we shall rely on the factual summary set forth by the Court of Appeals in *Ware II*,[1] and supplement it with facts pertinent to this appeal.

In *Ware II*, 360 Md. at 661–63, 759 A.2d 764, the Court wrote:

Ware and Kristi Gentry [ ] met and began dating in 1991. Their relationship became serious, and Ware moved into the house in Severn where Kristi lived with her mother, Nina Gentry, in August of 1993. In September of 1993, however, according to Nina Gentry's testimony, the relationship became strained, and Ware moved out.

On December 30, 1993, Nina Gentry returned home from work at midday and found Kristi, then 19, and her friend Cynthia Allen, 22, lying on the floor in the house. Each had been shot in the chest and at point-blank range in the head. Kristi was dead, and Cynthia died later in the hospital. Projectiles fired from a .380 caliber gun were found in the victims' bodies, and .380 caliber shell casings were found on the floor near the victims.

Most of the critical testimony in the case concerned events occurring the morning of the day of the murders, a few hours before Nina Gentry discovered the victims. At approximately 9:00 a.m., Kristi's friend Adrian Washington telephoned Kristi at the house. Adrian testified that Kristi sounded scared and that she abruptly hung up the phone twice. He then received a call from an angry male caller who quickly hung up; Ware's statement to the police indicated that Ware used caller ID to return Adrian's call, and told Adrian not to call the house again. Then, Adrian received a call from Kristi, during which he heard Kristi say, "Darris, I can't breathe. Get off me. You're hurting me."

---

1. We pause to note that we have not been provided with the complete transcript of the trial in *Ware II*.

After this call, Adrian immediately called his brother Thomas Washington, who in turn called the Gentrys' house. Thomas spoke to Ware, and the two argued. Thomas told Ware to stop what he was doing to Kristi, and Ware became angry. Ware asked Thomas whether he "was bulletproof" and threatened to "get [him] and [his] punk-ass brother."

After this conversation, at about 10:00 a.m., Thomas telephoned Kristi's brother Kevin Gentry at his place of employment in Laurel. Along with a co-worker, Kevin then drove to his mother's house, where he confronted Ware, beating him. Afterward, Kevin testified, Ware left the house, went to his car, retrieved a gun and pointed it at Kevin, threatening to kill him. Ware subsequently drove away. When Kevin also drove away to return to work, he came upon Ware returning to the house in his car; according to Kevin, Ware stopped and got out of the car and brandished a gun, as Kevin attempted to run Ware over with his car. Ware escaped harm. Kevin then returned to work in Laurel, arriving there before 12:00 noon.

Deborah Amrhein, a sales clerk at the On Target shooting range and sporting goods store in Severn, told police she saw Ware in the store at about lunch time on December 30. A store manager testified that one box of .380 caliber ammunition of the type and make used by the killer was sold on December 30 at about 12:10 p.m. Neighbors of the Gentrys testified that they saw Appellant arrive back at the house between 12:00 and 12:30 p.m. In his statement to the police, Ware admitted that he owned a .380 caliber handgun. The murder weapon was never found.

At about 12:00 noon, Edward Anderson, an inmate at the Maryland House of Corrections Annex in Jessup and a friend of Kristi, telephoned the house. He spoke to Cynthia, who told him that Ware was in the house and that Kristi and Ware were arguing. Anderson heard Kristi screaming. Then, Anderson heard three gunshots, followed by silence and the sound of someone hanging up the phone. Prison records indicated that this call terminated at 12:31 p.m. Anderson then called neighbors of the Gentrys and

asked them to check on the house; neighbor Clyburn Cunningham, Jr. went to the house and rang the doorbell. There was no answer.

Nina Gentry had spoken to Kevin Gentry earlier in the morning when he came, upset, to see her at her workplace, after his encounter with Ware. Some time after noon, she decided to leave work and go to the house. After finding the victims, she called 911. Paramedics and police came to the house. While the police were in the house, Ware called, identified himself, and spoke to police officers. Ware asked if Kristi was there. A police officer asked Ware to come to the house; the officer then departed to look for Ware at an address where he was believed to live. The officer encountered Ware a short distance away, driving toward the house, and arrested him.

The Court also referred to the testimony of Antonio Barnes, Ware's roommate. He "testified on direct examination to Ware's possession of a gun and to the search of their apartment after the shootings." *Id.* at 683, 759 A.2d 764.

After his arrest, Mr. Ware was advised of his *Miranda* warnings.[2] Mr. Ware initialed and signed an advice of rights form, indicating that he was willing to talk to the police without the presence of counsel. Thereafter, several police officers, including Detective Michael Praley, interrogated Ware from approximately 6:21 p.m. until 1:58 a.m. Ware never confessed to the murders.

At trial, during the questioning of Detective Praley, the following ensued:

[PROSECUTOR]: Now, when you began the interview, can you tell us what you first asked the Defendant?

[PRALEY]: It was suggested to him that we could be compassionate and understand how this could occur. *From that, we didn't get a reply.* So it was at that point we asked

---

**2.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the Defendant if he would recount his day for the last 24 hours.

(Emphasis added.)

Detective Praley's testimony continued with the details of his question-and-answer session with Ware, which included Ware's description of his activities leading up to the time of the killings. *Id.* at 214. At that time, Mr. Ware admitted that he saw Ms. Gentry the previous morning, and claimed that they had sexual relations. *Id.* at 215. According to Ware, Ms. Gentry told him that she was pregnant, and they argued after that revelation. During the altercation, appellant struck Ms. Gentry. *Id.* at 217. He also admitted that, later in the morning, he had a fight with Ms. Gentry's brother. *Id.* at 216.

In addition, Ware admitted that he owned a ".380" handgun. Detective Praley stated: "He described it as black grips with a silver frame." The following exchange ensued:

[PROSECUTOR]: Did he tell you where that gun was?

[PRALEY]: He told me that he kept [it] at his apartment. The apartment, being his, would be described [as] the one he was staying [in] over on Village Squares with Antonio Barnes.

[PROSECUTOR]: And did he tell you that—*did he say anything about its whereabouts on December 30th*?

[PRALEY]: *The gun?*

[PROSECUTOR]: *Yes.*

[PRALEY]: *No.*

[PROSECUTOR]: Did you ask him where you could find the gun?

[PRALEY]: It was asked. *I didn't get a response.*

[PROSECUTOR]: Okay. What else did he tell you?

[DEFENSE COUNSEL]: Your Honor, can we approach for a minute?

[THE COURT]: Yes.

(Emphasis added.)

A bench conference ensued:

[DEFENSE COUNSEL]: With respect to the interrogation, I think that the only thing that is admissible are the answers that the officer asked and the responses he gets. If there is no response, that should not be admissible, his post-Miranda—

[THE COURT]: What is the theory for that?

[DEFENSE COUNSEL]: Well, there is no answer.

[THE COURT]: I mean,—have a question and then—what is the Officer supposed to say?

[DEFENSE COUNSEL]: Well, he shouldn't be allowed to testify. He should only be allowed to testify to those answers that he got—those questions that he got responses to. If he didn't get a response, he shouldn't be able to testify.

[THE COURT]: No. No. No. The point of him testifying—exercise his right to remain silent. But he has given up that right to remain silent.

[DEFENSE COUNSEL]: Which he can invoke at any time.

[THE COURT]: And you—because he chooses not to answer a damning question, that he is now re-invoking his silence?

[DEFENSE COUNSEL]: I think my concern is that the answer could be inferred that somehow the failure to answer was somehow—one might—yes. It could be interpreted that way. It could be interpreted as an invocation of Defendant. The answer could be interpreted as an invocation of Defendant.

[THE COURT]: Well, I have no indication that he has now—chooses not to speak to the officer.

[DEFENSE COUNSEL]: You have him not answering, Your Honor.

[THE COURT]: Yes. Not answering one question. Did he answer any further questions?

[DEFENSE COUNSEL]: Two questions.

[THE COURT]: All right. Two questions.

\* \* \*

Did he answer any other questions?

[PROSECUTOR]: No. I believe that was the one that he did not respond to.

[THE COURT]: I know. But did he, the officer, ask him any other questions after this?

[PROSECUTOR]: Yes.

[DEFENSE COUNSEL]: That he got answers from?

[PROSECUTOR]: Yes.

[DEFENSE COUNSEL]: Okay.

[THE COURT]: I will leave the answer stand.

In its closing argument, the prosecution stated, without objection:

[Defense counsel] told you, in his opening statement, that his client is innocent. Completely innocent. Well, ladies and gentlemen, *where is the innocent man's gun? The police asked him that very question, and he doesn't answer.*

The police searched his Jeep. It is not there. The police looked behind the speaker in his apartment. In fact, they looked everywhere in his apartment, and that gun is nowhere to be found, ladies and gentlemen.[3]

This is only one reason that the Defendant's gun is nowhere to be found after these murders, and it is not a coincidence. The Defendant used his .380 Davis handgun to murder Christie and Cynthia and then got rid of the murder weapon so that he wouldn't be tied to the murders he had just committed.

---

**3.** We do not have the portion of the trial transcript pertaining to the search for the gun conducted by the police. However, Ware does not dispute that the police searched for his gun and never found it.

He believes, in his mind, at that point he has gotten rid of the only witness and the weapon. He will never be caught.

(Emphasis added.)

Mr. Ware was convicted of two counts of first-degree murder and two handgun convictions. *Ware II*, 360 Md. at 660, 663, 759 A.2d 764. Concluding that there were "no errors that tainted the proceedings," the Court of Appeals affirmed both the convictions and the death sentence. *Ware II, id.* at 660–61, 759 A.2d 764.

As noted, appellant sought post-conviction relief in 2002, which the circuit court granted, in part, on two grounds. First, the *Ware III* Court found that appellant received ineffective assistance of appellate counsel in *Ware II*, because his appellate attorney failed to challenge the admission of Detective Praley's testimony regarding appellant's post-*Miranda* silence. In its Memorandum Opinion and Order of June 28, 2002, the circuit court stated in *Ware III:*

Mr. Ware argues that his appellate counsel should have argued on appeal the issue of the officer's testimony regarding Mr. Ware's selective silence when interviewed immediately after the murders. Mr. Ware notes that his trial counsel did object to the admissibility of such testimony. Similarly, Mr. Ware argues that appellate counsel erred in not raising the preserved error on the requested separate consideration instruction.

Although Maryland law allows appellate counsel discretion in making the decision of which errors to bring forth on appeal, not raising this issue on appeal gives the Court great concern. *The Court finds the issue of the Officer's testimony regarding Ware's selective silence during his interrogation as a compelling issue on appeal, particularly since the error had been preserved by counsel.*

(Emphasis added.) [4]

Second, the circuit court determined that appellant received ineffective assistance of trial counsel at his sentencing in 1999.

---

[4] Notably, the *Ware III* Court did not grant a belated appeal based on trial counsel's failure to object to the State's closing argument, in which

**14**

Therefore, the *Ware III* Court awarded appellant a new sentencing hearing, explaining:

> Mr. Ware alleges that trial counsel was ineffective because he was unprepared for the capital sentencing phase of the trial. First, Mr. Ware contends that his trial counsel expected him to elect a judge sentencing, so he was unprepared when he chose to be sentenced by a jury. Although his trial counsel sought postponement, the request was denied. Second, Mr. Ware maintains that the failure to present the sole expert witness for the defense, a social worker and mitigation specialist as a live witness instead of by video deposition, prejudiced his case. Third, Mr. Ware's trial counsel did not request any specific sentencing instructions. Particularly, Mr. Ware asserts that a youthful age instruction would have been appropriate as it was a statutory mitigator.
>
> At the post-conviction hearing, trial counsel testified that they had not been prepared for the sentencing phase of trial before the jury and thus could not present the above mitigation evidence. Trial counsel testified that at all times they expected that the sentencing phase would be before the court. The State's Attorney, in his argument to this Court during the post conviction hearing, acknowledged error by trial counsel given the lack of preparedness for sentencing; in fact, when questioned by the Court as to the second prong of *Strickland,* the State's Attorney deferred the issue of prejudice for the Court's ruling rather than denying its effect. The Court concludes that these errors prejudiced Mr. Ware's sentencing phase such as to deny Mr. Ware his constitutionally guaranteed right to counsel.

The court's ruling culminated in a re-sentencing in 2004, at which the court received evidence regarding appellant's conduct in prison by way of transcripts of testimony from the

---

the State mentioned appellant's failure to respond to the police inquiry concerning the gun. Because appellant's Petition for Post–Conviction Relief is not in the record, we are unable to determine whether appellant argued this point.

1999 sentencing hearing.[5] Moreover, "Supermax" Correction-
al Officer Corporal Elizabeth Bean testified that Ware was
respectful and non-aggressive with prison staff, correctional
officers, and other inmates; that he was helpful with laundry
and cleaning; that he shared with other inmates; and that he
had never been a problem inmate.

Mr. Ware also presented testimony from a forensic psychia-
trist, David Williamson, M.D, who was accepted as an expert
on forensic and correctional psychiatry. He "had a face-to-
face interview and evaluation of the Defendant for two hours"
and extensively examined trial and sentencing testimony, doc-
umentary evidence of appellant's mother's mental health prob-
lems, interviews with appellant's military colleagues, social
acquaintances, and extended family members. He also re-
viewed appellant's "base file" from the Division of Corrections
and the two prior pre-sentencing investigations. Regarding
Mr. Ware's "base file," Dr. Williamson stated:

> I looked at his base file for tickets or infractions in the
> Division of Corrections—I believe you said he has been in
> for 11 years; I saw one infraction, allegedly for fighting,
> and infractions for having a chair in his cell and not moving
> at feet-up time; but not a history of recurrent assaults,
> aggression against correctional officers, extortion from
> peers and the like.

In addition, the court had two PSI reports from July 1995
and July 1999, prepared for previous sentencing proceedings
in the same case. The court indicated that it read all the
information that had been provided. However, no request
was made for an updated PSI report, nor was one obtained by
the court. On the first-degree murder charges, the court
sentenced Mr. Ware to two life sentences, without the possibil-
ity of parole. The court also imposed concurrent ten-year
sentences for the two handgun offenses.

---

5. The transcripts included testimony from Karen Irvin and Cheryl
Doyle, counselors for the Anne Arundel Department of Corrections, and
Scott Smith and Karen Norman, correctional officers for the Anne
Arundel Department of Corrections.

As noted, in 2002 the Court of Appeals deferred consideration of the belated appeal until the conclusion of the new sentencing, which occurred in October of 2004. As a result of that sentencing, this is no longer a death penalty case. Therefore, the matters of the belated appeal and the sentencing are now before this Court.

## DISCUSSION

## I.

### The Right to Remain Silent[6]

#### A. Contentions

Appellant contends that he "twice exercised his right to remain silent during post-*Miranda* interrogation."[7] Yet, he complains that, "having exercised this constitutionally protected right, the trial court permitted the prosecution to introduce [his] silence into evidence" through Detective Praley's testimony. Furthermore, he complains that the trial court erroneously permitted the prosecution, in its closing argument, to emphasize that Mr. Ware evidenced his guilt by remaining silent when the police asked him the location of his gun.

According to appellant, "a court must presume . . . that a defendant's post-*Miranda* silence is an exercise of his Consti-

---

6. Given the posture of the case, *i.e.*, a belated appeal of the *Miranda* issue, it is as if the issue is before us on direct appeal.

7. For convenience, we shall repeat the two instances in Detective Praley's testimony that are at issue here:

[PROSECUTOR]: Now, when you began the interview, can you tell us what you first asked the Defendant?
[PRALEY]: It was suggested to him that we could be compassionate and understand how this could occur. *From that, we didn't get a reply.* So it was at that point we asked the Defendant if he would recount his day for the last 24 hours.
(Emphasis added.)

 * * *

[PROSECUTOR]: Did you ask him where you could find the gun?
[PRALEY]: It was asked. *I didn't get a response.*
(Emphasis added.)

tutional right to remain silent." Appellant insists that it is "clear error to allow a defendant's post-*Miranda* silence into evidence unless the State satisfies its heavy burden of showing by clear and convincing evidence that the defendant's silence was not an invocation of his right to remain silent." In his view, the State did not meet its "heavy burden," because it did not introduce evidence at the 1999 trial "suggesting that Mr. Ware's silence was other than an invocation of his right to remain silent," nor did the trial court make "any findings to that effect."

Furthermore, appellant argues that the error was not harmless. He claims that this Court must reverse unless the State can show, beyond a reasonable doubt, that "(1) the violation was technical in nature, *and* (2) that the erroneously admitted evidence was merely cumulative, *and* (3) that there was other properly admitted evidence that was overwhelming and largely uncontroverted." According to Mr. Ware, the trial court's error was "more than merely technical or procedural error because the court allowed the prosecution to use Mr. Ware's silence as substantive evidence of guilt, and because the error violated a substantial constitutional right of Mr. Ware." Nor was it merely cumulative, argues appellant, because the "[p]olice had not located Mr. Ware's gun, and the State could produce no direct evidence to show that his gun was used in the killings." And, he contends that the evidence against him "was not overwhelming and was controverted," and was "weaker than the evidence against the defendant in *Younie*."

The State counters: "Preliminarily, Ware failed to properly preserve his argument for appeal." Referring to Detective Praley's testimony that Ware failed to respond when the police suggested that they had "compassion" and would "understand" what had happened, the State points out that Ware did not object when "Praley testified to the absence of a response from Ware [to that comment] during the interview...." In its view, the "failure to object constitutes a waiver of the claim on appeal." With regard to the inquiry as to the gun, the State contends: "[T]he second objection came

long after the pertinent question and answer. This belated objection also constitutes a waiver of the claim on appeal." [8]

Even if preserved, the State argues that "the trial court's ruling was entirely correct." Although it recognizes that post-arrest silence is generally inadmissible as substantive evidence of guilt, it asserts:

> [N]one of these cases holds that the absence of a response to a question during an interview after being given full *Miranda* advisements and agreeing to the interview is the equivalent of silence. Further, it is a stretch of the imagination to read Ware's non-response to two questions as revocation of his earlier *Miranda* waiver.

Alternatively, the State posits: "Even assuming, *arguendo*, it was error to admit the testimony of Detective Praley, such error was harmless beyond a reasonable doubt." According to the State, the evidence "as recounted by the Court of Appeals" was "overwhelming" and, "[g]iven the evidence presented, which clearly established Ware's guilt in the murders ... there is no possibility that the testimony of Detective Praley effected [sic] the verdict." It adds: "Although the prosecutor made mention of the testimony in closing argument, the record shows that the prosecutor did not *use* the testimony as suggested by Ware." Regarding the gun, the State contends that the prosecutor merely "commented on the absence of the gun, but did not argue that Ware's failure to answer the question constituted evidence of Ware's guilt or guilty conscience."

As noted, the circuit court granted appellant a belated appeal, based on ineffective assistance of appellate counsel, finding "the issue of Praley's testimony regarding Ware's selective silence during his interrogation as a compelling issue on appeal, *particularly since the error had been preserved* by trial counsel."

---

8. The State does not discuss waiver as to appellant's failure to object to the State's closing argument.

 "It is well established that a party opposing the admission of evidence 'shall' object 'at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived.'" *State v. Jones,* 138 Md.App. 178, 218, 771 A.2d 407 (quoting Md. Rule 4–323(a)), *aff'd,* 379 Md. 704, 843 A.2d 778 (2004); *see Klauenberg v. State,* 355 Md. 528, 545, 735 A.2d 1061 (1999); *Prout v. State,* 311 Md. 348, 356–57, 535 A.2d 445 (1988); *Hill v. State,* 134 Md.App. 327, 351, 759 A.2d 1164, *cert. denied,* 362 Md. 188, 763 A.2d 735 (2000). Moreover, an objection must be made when the question is asked or, if the answer is objectionable, then at that time by motion to strike. *See Bruce v. State,* 328 Md. 594, 627–30, 616 A.2d 392 (1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993); *Dyce v. State,* 85 Md.App. 193, 582 A.2d 582 (1990) (generally, "improper evidence will not be preserved for appellate review unless the party asserting error objected at the time the evidence was offered or as soon thereafter as the grounds for the objection became apparent."). "A timely objection ... enables the trial court to attempt to cure any error, which helps to avoid unnecessary appeals." *Jones,* 138 Md.App. at 218, 771 A.2d 407; *see Hall v. State,* 119 Md.App. 377, 389, 705 A.2d 50 (1998). Accordingly, the admissibility of evidence may only be reviewed when an objection is timely made. *Kang v. State,* 393 Md. 97, 122–23, 899 A.2d 843 (2006); *Klauenberg,* 355 Md. at 545, 735 A.2d 1061; *Conyers v. State,* 354 Md. 132, 149, 729 A.2d 910, *cert. denied,* 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999); *Holmes v. State,* 116 Md.App. 546, 558, 698 A.2d 1139, *aff'd,* 350 Md. 412, 712 A.2d 554 (1998).

 Furthermore, objections must be reasserted unless an objection is made to a continuing line of questions. *Brown v. State,* 90 Md.App. 220, 225, 600 A.2d 1126 (1992) (noting that either an objection must be made to each question or a continuing objection must be made to the entire line of questioning). *See also Johnson v. State,* 325 Md. 511, 515, 601 A.2d 1093 (1992) (where it was apparent that the court's ruling on further objection would be unfavorable to the defense and persistent objection would only highlight the remarks for the

jury, the absence of further objection did not constitute waiver); *Williams v. State,* 131 Md.App. 1, 26, 748 A.2d 1 (2000) ("When evidence is received without objection, a defendant may not complain about the same evidence coming in on another occasion even over a then timely objection.").

We shall first consider defense counsel's failure to object to Praley's testimony that appellant did not respond when the officer remarked during the interrogation that the police are "compassionate" and could "understand how this could occur." Both sides want it both ways. For purposes of waiver, the State asserts that appellant should have objected. Yet, in regard to the merits, it conveniently asserts that there was neither error nor harm because "no inference whatsoever" can be drawn from appellant's failure to reply, given that the remark "was not even a question." Similarly, to support his preservation claim, appellant conveniently maintains that Praley's comments (that the police were "compassionate" and could "understand" what happened) were easily construed as innocuous remarks that did not invite a response, and thus no objection was required. In contrast, he vigorously asserts, on the merits, that his silence to a non-question was an invocation of his Fifth Amendment right.

As we see it, defense counsel's failure to object to this line of testimony constituted a waiver of any complaint about it. As we have pointed out, the State argues that no adverse inferences could be drawn from appellant's silence in regard to these remarks by Praley; they were comments, not a question, says the State. If so, then it is equally difficult to understand the State's assertion that appellant's failure to object to the comments amounted to a waiver of his complaint about the unrelated testimony concerning Ware's silence as to the gun. Put another way, defense counsel's failure to object to a non-answer to a non-question would not preclude appellate counsel from complaining about the police testimony concerning appellant's silence as to the gun, so long as an objection was timely lodged.

■ Therefore, we turn to the waiver issue with regard to the gun inquiry. Contrary to the State's assertion, the defense did not object to the gun inquiry "long after the pertinent question and answer." Rather, the record demonstrates that defense counsel asked to approach the bench almost immediately after Detective Praley's testimony that appellant remained silent when asked about the location of the handgun. At the bench, defense counsel raised the precise contention advanced here: the silence was inadmissible. If the defense objects "at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent," the underlying issue is preserved. Md. Rule 4–323(a); *Bruce v. State,* 328 Md. 594, 627–8, 616 A.2d 392 (1992).[9] We easily conclude that, with respect to the gun, the issue as to the admissibility of appellant's selective silence is preserved for our review.

### B. Analysis

■ The privilege against self-incrimination is a "mainstay of the American criminal justice system." *Kosh v. State,* 382 Md. 218, 233, 854 A.2d 1259 (2004). When a defendant in police custody exercises the right to remain silent, a trial court generally may not allow the State to introduce evidence of that silence as substantive evidence of guilt. *Id.* at 220, 854 A.2d 1259 ("Post-arrest silence is inadmissible as substantive evidence of a criminal defendant's guilt, regardless of whether that silence precedes the recitation to the defendant of *Miranda* advisements.") Indeed, "Evidence of post-arrest silence, after *Miranda* warnings are given, is inadmissible for any purpose, including impeachment." *Grier v. State,* 351 Md. 241, 258, 718 A.2d 211 (1998) (citing *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976)). *See* U.S. CONST. amends. V and XIV; Md. Dec. of R. Art. 22; *Doyle,* 426 U.S. at 618, 96 S.Ct. 2240; *Weitzel v. State,* 384 Md. 451, 455–58, 863 A.2d 999 (2004).

---

**9.** Although appellant did not formally move to strike, the State does not raise that contention, presumably because of appellant's lengthy but unsuccessful discussion of the issue at the bench.

**22**

As the *Grier* Court explained, " 'silence is so ambiguous that it is of little probative force.' " *Grier*, 351 Md. at 252, 718 A.2d 211 (quoting *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975)). It added: "When a defendant is silent following *Miranda* warnings, he may be acting merely upon his right to remain silent," and "a defendant's silence at that point carries little or no probative value, and a significant potential for prejudice." *Id.* at 258, 718 A.2d 211. *See Miller v. State*, 231 Md. 215, 218–19, 189 A.2d 635 (1963)(suspect in custody has the right to remain silent and " 'mere silence should afford no inference whatever of acquiescence' " to accusations) (citation omitted); *Garner v. State*, 142 Md.App. 94, 108, 788 A.2d 219 (stating that "prosecutor should not have been permitted to ask appellant a question that . . . insinuated that he chose to remain silent after he turned himself in to the police"), *cert. denied*, 369 Md. 181, 798 A.2d 553 (2002); *Zemo v. State*, 101 Md.App. 303, 646 A.2d 1050 (1994) (holding that, after a defendant has been given his *Miranda* rights, "[a]dverse comment (nay, all comment) on a defendant's invocation of a right to silence is constitutionally forbidden"); *Wright v. State*, 26 Md.App. 60, 336 A.2d 808 (1975); *Burko v. State*, 19 Md.App. 645, 652, 313 A.2d 864 (1974).

According to appellant, *Younie v. State*, 272 Md. 233, 322 A.2d 211 (1974), is "strikingly similar" to this case, and directly controls. In *Younie*, 272 Md. 233, 322 A.2d 211, the defendant was convicted of armed robbery and murder. During a custodial interrogation, he waived his right to remain silent, in that he agreed to answer "some" questions about the crimes, but refused to answer all of them. *Id.* at 236–38, 322 A.2d 211. Nevertheless, he signed the bottom of each page of the interrogating officer's handwritten statement of the interview. *Id.* at 235, 322 A.2d 211. At trial, over objection, the court admitted the officer's handwritten record of the interview, in which Younie answered fifteen out of twenty-three questions. *Id.* at 236–38, 322 A.2d 211. During closing argument, the State was allowed to refer to Younie's refusals to respond to all of the questions. *Id.* at 238, 322 A.2d 211.

On appeal, Younie complained that "his silence was a permissible exercise of his [constitutional] privilege," and therefore the trial court should not have admitted in evidence the record of his refusals to answer. *Id.* The Court of Appeals agreed. It held that admission of evidence that the defendant remained silent "creat[ed] the highly prejudicial inference that his failure to respond was motivated by guilt. . . ." *Id.* In the Court's view, the only reasonable inference to be drawn from the refusals to answer was that Younie elected to exercise his constitutional right to remain silent, but a jury might improperly regard his silence as a tacit admission. *Id.* at 244, 322 A.2d 211.

The Court instructed: "[T]he Constitution . . . expressly permits [a suspect] to remain mute and not have this made known to [the jury]." *Id.* Further, it stated, *id.* (emphasis added):

Silence in the context of a custodial inquisition is presumed to be an exercise of the privilege against self-incrimination from which no legal penalty can flow, and the State has the heavy burden of demonstrating *by clear and convincing evidence that a failure to respond was not an invocation of this right.*

The Court also said, *id.* at 245, 322 A.2d 211:

Since a waiver of this constitutional right to be effective must be clearly and intentionally made, and since silence, even in the face of incriminating accusations, statements, or questions, is inaction and therefore difficult to draw an inference from, in a situation such as this where it is uncertain as to what occurred, we must assume that the petitioner's [sic] failure to answer was an invocation of his fifth amendment privilege. We agree with the Court of Special Appeals when it said in *Duckett v. State,* 3 Md.App. 563, 578, 240 A.2d 332 (1968) that "[a]s the [petitioner was] then in police custody, the admission of evidence calculated to show that [he] stood mute in the face of such accusation would, of course, have been clear error."

Appellant avers that, as in *Younie*, he was interrogated after he was arrested and signed an advisement of rights form; he selectively chose not to respond to multiple questions during custodial interrogation (including a question about the whereabouts of the suspected weapon); and police officer testimony indicated that he did not respond to certain incriminating questions. Thus, Ware insists that the trial court improperly allowed the State to introduce evidence of his silence, and erred in allowing the State to refer to Ware's silence in its closing argument.

The State maintains that the case *sub judice* is distinguishable from *Younie*. Noting that *Younie* involved an officer's handwritten statement, which showed the defendant's refusal to answer eight of twenty-three questions, the State explains:

> In the present case, there was no such written statement. In the first instance, there was not even a question. Detective Praley testified that "[i]t was suggested to him that we could be compassionate and understand how this could occur. From that, we didn't get a reply." There is no inference whatsoever that can be drawn from "no reply" to such a suggestion. In the second instance, Detective Praley's testimony established that, after Ware admitted to owning a .38 handgun, that Ware was asked about the location of the gun, and that the police did not get a response. Again, there is no inference to be drawn from Detective Praley's testimony that the police did not get a response to their question regarding the location of the gun. There was no indication, whatsoever, that Ware refused to answer the question, like in *Younie*. Even less reasonable is the notion that Ware revoked his *Miranda* waiver for [the] sole inquiry regarding the location of the gun, especially after he admitted to owning the gun and keeping it at his apartment.

*Crosby v. State*, 366 Md. 518, 784 A.2d 1102 (2001), also provides guidance. There, the defendant "was *not* silent in responding to a particular question...." Instead, he refused to put into writing that which he had already said. *Id.* at 529, 784 A.2d 1102. The Court of Appeals considered whether that

refusal amounted to an invocation of the privilege against self-incrimination and, if so, whether the testimony concerning such invocation was improperly permitted at trial, and thus "impinged" the defendant's "constitutional right to remain silent." *Id.* at 529–30, 784 A.2d 1102. It recognized that "[a]n accused may invoke his or her rights at any time during questioning, or simply refuse to answer any question asked, and this silence cannot be used against him or her." *Id.* at 529, 784 A.2d 1102. The Court explained: "The protections bestowed upon citizens by the privilege against self-incrimination do not disappear once the accused initially waives his or her rights. An accused may invoke his or her rights at any time during questioning, or simply refuse to answer any question asked, and this silence cannot be used against him or her." *Id.* (citations omitted).

However, the *Crosby* Court concluded that the defendant did not exercise his right to remain silent by refusing to provide a written statement after he gave an oral statement. Rather, said the Court, he simply declined " 'to reduce to writing his existing statement and waiver of rights....' " *Id.* at 530, 784 A.2d 1102 (citation omitted). While recognizing that "the right to remain silent 'has always been liberally construed in order to give fullest effect to this immunity,' " *id.* at 528 n. 8, 784 A.2d 1102 (citations omitted), the Court declined "to extend *Miranda*'s application to an illogical extreme." *Id.* at 530, 784 A.2d 1102. *See also State v. Purvey,* 129 Md.App. 1, 18–19, 740 A.2d 54 (1999) (noting that defendant who declined to reduce his oral statement to writing "did not choose to remain silent; he only refused to reduce to writing his existing statement and waiver of rights"; the Court "refuse[d] to extend under *Miranda* ... a refusal to write out one's statement into a full-fledged assertion of one's right to silence.").

*Dupree v. State,* 352 Md. 314, 722 A.2d 52 (1998), is also noteworthy. There, the Court reversed a murder conviction because the police officer testified, over defense objection, that the defendant was advised of his constitutional rights and did not provide a statement to the police. *Id.* at 316, 722 A.2d 52.

The Court determined that evidence of the advisement "lacked the threshold relevancy necessary for admissibility," *id.* at 324, 722 A.2d 52, and "was immaterial to any issue in the trial." *Id.* at 332, 722 A.2d 52. Further, it ruled that because the defendant "gave no statement to the police," the jury did not need to know of the *Miranda* warnings "to complete its appointed task." *Id.*

We are also guided by *Freeman v. State*, 158 Md.App. 402, 857 A.2d 557 (2004). Freeman was convicted of first-degree premeditated murder in connection with the fatal shooting of her boyfriend. Shortly after the shooting, appellant went to the police station, with the firearm still in her purse, and announced: "I just shot someone." *Id.* at 408, 857 A.2d 557. She was subsequently advised of her *Miranda* rights. *Id.* at 409, 857 A.2d 557. However, when asked if she would "knowingly waive these rights," appellant "didn't say anything." *Id.* The arresting officer then asked appellant "what happened tonight," to which Freeman responded, "I don't want to talk about it right now." *Id.* Approximately three hours after her arrival at the police station, a second officer again advised Freeman of her *Miranda* rights, which she waived. *Id.* at 411, 857 A.2d 557. Freeman then gave an oral confession, which she later sought to suppress, without success. *Id.* at 408, 857 A.2d 557.

On appeal, Freeman argued that she had invoked her Fifth Amendment privilege by remaining silent when the police initially asked her if she was willing to waive her rights. *Id.* at 419, 857 A.2d 557. Moreover, she insisted that, because her silence was an invocation of her right to remain silent, "all questioning was required to cease." *Id.* Therefore, she claimed that her statement, "I don't want to talk about it right now," as well as her later confession, after having signed a waiver, were "erroneously admitted at trial in violation of *Miranda*," because both were obtained after she invoked her right to silence. *Id.*

In *Freeman*, the State relied on *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), which involved an ambiguous invocation of the right to counsel

during an interrogation. It argued by analogy that Freeman's silence was ambiguous and did not amount to an invocation of rights. The Court observed that, unlike in *Davis*, in which the alleged invocation "occurred *during* an interrogation and *after* a waiver of rights," Freeman's first "alleged invocation of her right to silence occurred *prior* to a waiver of rights, and before interrogation ensued...." Id. at 425, 857 A.2d 557. Because appellant's silence occurred in a pre-waiver context, we declined to apply the rationale of *Davis* to appellant's silence, *id.* at 429, 857 A.2d 557, reasoning that "the logic of *Davis* ... does not extend to an ambiguous invocation that occurs prior to the initial waiver of rights." *Id.* at 425, 857 A.2d 557.

The Court concluded that the suppression court erred in failing to construe Freeman's pre-waiver silence as an invocation of the right to remain silent. *Id.* at 433, 857 A.2d 557. Consequently, we held that Freeman's subsequent statement, "I don't want to talk about it right now," was erroneously admitted at trial. *Id.* Nevertheless, we determined that the error was harmless. *Id.* at 434, 857 A.2d 557.

In our view, the statement, "I don't want to talk about it right now," considered in context, could "not be regarded as a tacit admission of guilt." *Id.* at 434, 857 A.2d 557. We explained: "The undisputed evidence showed that appellant came to the police station of her own accord and immediately announced that she had shot someone." *Id.* "In that light," said the Court, appellant's "subsequent statement ... is 'fairly innocuous.'" *Id.* (citation omitted). We added that "the State certainly did not strengthen its case with the admission of [the] statement...." *Id.* Therefore, we were "amply satisfied that 'there is no reasonable possibility' that the admission of [the first statement] contributed to the rendition of the guilty verdict." Furthermore, we concluded that "it does not necessarily follow that the court erred in admitting appellant's subsequent confession," which was obtained after a valid waiver of rights.[10] *Id.* (citations omitted).

---

10. We noted that, after Freeman stated, "I don't want to talk about it right now," her request was " 'scrupulously honored' for almost three

█ Ware's silence when the police remarked that they could be "compassionate" and understanding did not amount to an invocation of the right to silence; it was, as we said earlier, a non-answer to a non-question. Indeed, in arguing that his contention was preserved, despite his failure to object, appellant conceded that the remark was innocuous and did not invite a response. In that light, it is difficult to discern a basis to construe the silence as an invocation of appellant's Fifth Amendment right.

Even if the silence amounted to an invocation of rights, we are persuaded that the admission of the evidence was harmless beyond a reasonable doubt. We reiterate that appellant argued as to preservation that the detective's remarks did not require a response. The flip side is that it is difficult to embrace appellant's complaint of error or harm in permitting the introduction of testimony concerning a non-answer to a non-question.

█ On the other hand, the foregoing cases compel us to conclude that the court erred in admitting evidence of appellant's silence when he was asked about the location of the gun. As appellant asserts in his reply brief, "non-responses during custodial interrogation are clearly and precisely what the courts of the United States and Maryland consistently protect." Nevertheless, we are satisfied, beyond a reasonable doubt, that, in the context of this case, any error in admitting such evidence was harmless beyond a reasonable doubt. *See*

---

hours, until a different investigator ... sought to question her after again advising her of her *Miranda* rights. At that time, Freeman agreed to waive her rights." *Id.* at 440, 86 S.Ct. 1602. In our view, Freeman's earlier assertion that she did not want to talk about it "now" did "not 'destroy all lines of communication nor make a prelude by the defendant absolutely necessary....' " *Id.* Consistent with *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) ("[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored' "), we were satisfied that "a reasonable period of time elapsed between appellant's invocation of her right to silence ... and the interrogation conducted" three hours later by a different investigator. *Freeman*, 158 Md.App. at 440, 857 A.2d 557.

*Borchardt v. State,* 367 Md. 91, 131, 786 A.2d 631 (2001), *cert. denied,* 535 U.S. 1104, 122 S.Ct. 2309, 152 L.Ed.2d 1064 (2002); *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976); *Hudson v. State,* 152 Md.App. 488, 508–09, 832 A.2d 834, *cert. denied,* 378 Md. 618, 837 A.2d 928 (2003). We explain.

 At the outset, we reject appellant's claim that the State's case was based "purely" on circumstantial evidence. But, even if it were, the evidence is no less damning. *See Ware II,* 360 Md. at 661–63, 759 A.2d 764. It is well-settled that "circumstantial evidence alone is 'sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused.'" *Painter v. State,* 157 Md.App. 1, 11, 848 A.2d 692 (2004) (citation omitted). *Accord Wilson v. State,* 319 Md. 530, 537, 573 A.2d 831 (1990); *Hall,* 119 Md.App. at 393, 705 A.2d 50. Notably, there is no difference in the weight of direct or circumstantial evidence. *Mangum v. State,* 342 Md. 392, 398, 676 A.2d 80 (1996); *Hebron v. State,* 331 Md. 219, 226, 627 A.2d 1029 (1993); *Wagner v. State,* 160 Md.App. 531, 560 n. 22, 864 A.2d 1037 (2005); *Allen v. State,* 158 Md.App. 194, 249, 857 A.2d 101 (2004), *aff'd,* 387 Md. 389, 875 A.2d 724 (2005); *Hagez v. State,* 110 Md.App. 194, 204, 676 A.2d 992 (1996).

The evidence clearly placed appellant at the scene of the murders on the day in question. Earlier that day, he fought with Ms. Gentry's brother on the premises where the murders occurred, and brandished a gun. Appellant admitted that he owned a .38 handgun, and evidence linked Mr. Ware to the purchase of .38 caliber bullets at a sporting goods store on the day in question. A store manager testified that one box of .38 bullets was sold at about 12:10 p.m. that day, and a sales clerk at the store identified Mr. Ware as being in the store around lunch time on the day of the murders. In addition, neighbors of the Gentrys saw appellant arrive at the murder scene between noon and 12:30 p.m.

Furthermore, Edward Anderson, an inmate at the Maryland House of Corrections in Jessup, placed appellant at the scene

when the gunshots were fired. He testified that at around noon he spoke on the phone with Cynthia Allen, who told him that Kristi Gentry and appellant were arguing. Anderson also testified that he heard Kristi Gentry screaming, then heard three gunshots, followed by the sound of the telephone being hung up. Prison telephone records indicated that this call terminated at 12:31 p.m.[11]

Although Ware admitted to owning a .38 handgun, it was never found. Detective Praley testified that Ware said "he kept [the gun] at his apartment," and Ware's roommate testified that the police searched their apartment. In closing argument, the prosecutor stated that "[t]he police searched [Ware's] jeep. It is not there. The police looked behind the speaker in his apartment. In fact, they looked everywhere in his apartment, and that gun is nowhere to be found...." The State suggested that appellant "got rid" of the weapon because it "tied [him] to the murders." The prosecutor asserted in her closing argument: "He believes, in his mind, at that point he has gotten rid of the only witness and the weapon."[12]

Had the court barred admission of appellant's silence as to the location of the gun, that would not have made the gun's absence any less conspicuous. Appellant's weapon was missing—that much was plain. The prosecutor's statement in

---

11. Appellant avers that this witness was "substantially impeached," and he provides a transcript citation. However, that transcript is not in the record before us. In any event, the jury was entitled to credit Anderson's testimony. As the Court of Appeals stated in Ware II, 360 Md. at 679–80, 759 A.2d 764:

Anderson's testimony that the prosecutor and detective said he was being truthful when he brought information to them was inadmissible.... Nevertheless, the form of the evidence reduced its prejudicial impact.... Moreover, it is implicit that the police believed Anderson or they would not have gone to bat for him at the hearing on his motion to reduce his sentence. Although error, we hold that the error was harmless beyond a reasonable doubt. We are "satisfied that there is no reasonable possibility that the evidence complained of ... may have contributed to the rendition of the guilty verdict." Dorsey v. State, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

12. As noted, the defense did not object to the State's closing, including its comment that appellant failed to answer when asked about the gun.

closing arguments that appellant "doesn't answer" when asked about the location of the gun was cumulative, because the jury was presented with admissible evidence that appellant owned a gun and the police could not find it, despite their efforts to locate it.

## II.

### Pre–Sentence Investigation Report

 Appellant challenges as "plain error" the trial court's failure to obtain and consider an updated PSI prior to his 2004 sentencing. He notes that, before his 1995 and 1999 sentencings, the trial courts obtained and considered then-current PSI reports. According to appellant, "[b]y relying on those two prior reports that were eight and five years old, the court in 2004 did not have the benefit of a full review of Mr. Ware's history by the Department of Parole and Probation ('DPP')."

According to appellant, Maryland Code (1999, 2005 Supp.), §§ 6–112(c)(1) & (3) of the Correctional Services Article ("C.S."), required the court to consider a current PSI because he faced a sentence of life in prison without the possibility of parole. He maintains that a defendant has no obligation to request a PSI, and so his failure to do so did not relieve the court of its duty to obtain an updated PSI before imposing sentence.

Appellant concedes that "Maryland courts have yet to decide whether sentencing courts or juries must use *current* PSI reports." But, he cites to requirements in other states as to the use of current PSI's, "because they provide complete and accurate information about the defendant." He explains:

An outdated PSI report does not provide a comprehensive picture of the defendant's history, and excludes important information about the defendant's more recent behavior. *See, e.g., People v. Laster,* 140 A.D.2d 233, 528 N.Y.S.2d 831 (N.Y.App.Div.1988) (holding that PSI reports that were two years old and eight years old were inadequate because they lacked current information).[ ] Time spent in prison is likely to have had an effect on a defendant and should be

considered by the sentencing judge. *People v. Saez*, 121 A.D.2d 947, 948, 505 N.Y.S.2d 148 (N.Y.App.Div.1986) (reversing the defendant's sentencing because the court considered a PSI report that was over three years old and excluded the defendant's history while incarcerated).

Similarly, the high court of Michigan has held that sentencing a defendant without complete and accurate information about him, including information related to his behavior in prison, defeats modern sentencing policies. *People v. Triplett*, 407 Mich. 510, 287 N.W.2d 165 (1980).[ ] In *Triplett*, the Michigan Supreme Court reasoned that a judge needs updated information about the defendant because "sentencing must be individualized and tailored to the particular circumstances of the case and the offender *at the time of sentencing*." *Id.* at 166 (emphasis added). The court in *Triplett* held that the trial court erred when it relied on an outdated, four-year-old PSI report which failed to include updated information about the defendant's behavior and progress toward rehabilitation during the five years he had spent in prison. *Id.*

According to the State, we "should decline to review Mr. Ware's argument regarding the lack of an updated PSI report because Ware failed to make such an argument or request before the sentencing judge." Accordingly, the State asserts that an exercise of our discretion regarding "plain error review is unwarranted."

The State acknowledges that in *Sucik v. State*, 344 Md. 611, 689 A.2d 78 (1997), on which appellant relies, the Court ruled that the then-operative statute "imposed no duty on the defendant to request a PSI, but rather created a duty for the sentencing court." But, it distinguishes this case from *Sucik* by arguing that Mr. Ware's sentencing court had "not one, but two, PSI's that were prepared for the prior sentencing proceedings." And, it claims that other evidence presented by appellant regarding Mr. Ware's subsequent years in prison obviated the need for a third PSI.

C.S. § 6–112(c), titled **"Presentence investigation report; other investigations and probationary services,"** provides:

(c) *Same—Required.*—(1) The Division shall complete *a* presentence investigation report in each case in which the death penalty *or imprisonment for life without the possibility of parole is requested* under § 2–202 or § 2–203 of the Criminal Law Article.

(2) The report shall include a victim impact statement as provided under § 11–402 of the Criminal Procedure Article.

(3) The court or jury before which the separate sentencing proceeding is conducted under § 2–303 or § 2–304 of the Criminal Law Article shall consider the report.

(Emphasis added.)

As we see it, resolution of this issue turns on fundamental principles of statutory construction. In ascertaining the meaning of a statute, we generally begin with the words of the text, giving them their ordinary meaning. *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128 (1998); *Gardner v. State,* 344 Md. 642, 647–48, 689 A.2d 610 (1997). If a term or provision is ambiguous, we consider the language "in light of the ... objectives and purpose of the enactment," in order to ascertain the legislative intent. *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986). In this regard, "we may ... consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Department of Employment & Training,* 309 Md. 28, 40, 522 A.2d 382 (1987). On the other hand, when the Legislature's intent is evident from the statutory text, and the statute is not ambiguous, we ordinarily "end our inquiry and allow the plain meaning of the statute to govern our interpretation." *Langston v. Langston,* 366 Md. 490, 508, 784 A.2d 1086 (2001). That is the circumstance of this case.

C.S. § 6–112(c) requires the Division to complete "*a* " PSI "in **each case**...." (Emphasis added.) The statute does not provide that, upon reversal of a conviction that results in a retrial, a new PSI must be obtained. The Legislature easily

could have required a new PSI in such circumstances if that was its intent.

In *Sucik,* the Court ruled that it was plain error for the court not to obtain a PSI, even though "no one—not the court, the State, Sucik, or Sucik's stand-by counsel—even mentioned the statutory requirement that a PSI be obtained, *and none was prepared." Id.* at 614, 689 A.2d 78 (emphasis added). In contrast, two PSI's had already been obtained by the court by the time of Ware's last sentencing. And, each PSI included the requisite victim impact statement.[13] Moreover, despite the appeals and remands, it was, indeed, the same "case." Therefore, the literal text of C.S. § 6–112 was satisfied (the Division must complete a PSI "in each case. . . ."). Furthermore, to the extent that appellant wanted to update the PSI to address his behavior while in prison, he did so by presenting such evidence; the sentencing court heard testimony in mitigation that accounted for the previous five years of Ware's incarceration.

 In regard to the imposition of sentence, a judge ordinarily considers the facts and circumstances of the crime, the defendant's background, and any prior offenses. *Poe v. State,* 341 Md. 523, 531, 532, 671 A.2d 501 (1996). "The decision to incarcerate a defendant," wrote the Court of Appeals in *Nelson v. State,* 315 Md. 62, 553 A.2d 667 (1989),

> is the most important single decision made by the criminal justice system. It is, therefore, essential, in our view, that the decision be a knowledgeable one and that the sentencing judges be provided with a quantity of information necessary to insure appropriate dispositions.

*Id.* at 68, 553 A.2d 667 (quoting testimony of the Deputy Secretary of the Department of Public Safety and Correctional Services). The two PSI's and the additional information presented to the court are consistent with a sentencing judge's

---

**13.** It is unclear whether the trial court received current victim impact statements. The transcript of the sentencing hearing indicates that members of Ms. Gentry's family were not in favor of the death penalty.

dispensation of a "knowledgeable" disposition. The trial court did not err by not obtaining a third PSI report.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**