29 A.3d 635

Daymar Lydell WIMBISH

v.

STATE of Maryland.

No. 1672, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Sept. 29, 2011.

240

242

244

Benjamin C. Sutley, Baltimore, MD, for Appellant.

Diane E. Keller (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: KRAUSER, C.J., GRAEFF, and HOTTEN, JJ.

KRAUSER, C.J.

Convicted, after a jury trial in the Circuit Court for Howard County, of attempted robbery with a dangerous weapon, conspiracy to commit robbery with a dangerous weapon, and multiple weapons offenses,[1] appellant, Daymar Lydell Wimbish, presents the following questions for our review:

---

1. Appellant was charged with, and convicted of, possession of a regulated firearm by a person previously convicted of a crime of violence; possession of a regulated firearm by a person under age 21; and possession of a short-barreled shotgun. *See* Md.Code (2003), §§ 5–133 and 5–203 of the Public Safety Article.

I. Did the circuit court err in denying his motion to suppress his statements to police?

II. Did the circuit court err in admitting evidence of his gang affiliation?

III. Did the circuit court err in instructing the jury that he had previously been convicted of a "crime of violence"?

IV. Did the circuit court err in propounding certain questions during voir dire?

V. Did the cumulative effect of "inadmissible and admissible prejudicial evidence" deny him a fair trial?

VI. Did the circuit court err in failing to merge his three convictions arising out of his possession of a firearm?

For the reasons that follow, we shall reverse the judgment of the conviction for possession of a regulated firearm by a person under the age of twenty-one and affirm all other judgments.

## Background

Early on the morning of May 17, 2008, appellant, a member of the "Bloods" gang, led members of that gang in an attempted armed robbery of the occupants of a vehicle driven by a Jason Batts. The attempted robbery ended in the shooting and killing of that young man. But, Batts was not the intended target of the shooting. A passenger in Batts's car named Elijah Jackson was. He had purportedly given information to police about another member of the Bloods, Ronald McConnell.

The events leading up to the shooting began when McConnell learned that Elijah Jackson was "snitching" on him to the police. So, on the evening of May 16th, McConnell, who lived in Columbia, Maryland, telephoned his cousin, Lamont Johnson, while Johnson was at appellant's apartment, in Baltimore County, with another member of the Bloods, Ms. Jazmica Johns. McConnell instructed Lamont Johnson to come to Columbia for the purpose of robbing Elijah Jackson. Johnson and Jazmica Johns then met McConnell and other Bloods at a Columbia apartment which was used as a staging area for

drug- and gang-related activities. There, McConnell gave Johnson a "12–gauge sawed-off" shotgun, which would later be used in the shooting.

Later that evening, during a telephone conversation, Lamont Johnson asked appellant to meet him in Columbia. Appellant left for Columbia, taking with him another member of the Bloods, Kevin Jennings. On the way to Columbia, appellant told Jennings that the purpose of the trip was to "handle business" that related to someone who had "snitched on our OG's [2] cousin." Although the precise rank of each of the gang members is not entirely clear, the testimony suggested that appellant occupied a higher position in the Bloods than either Jazmica Johns, Lamont Johnson, or Kevin Jennings.

Once in Columbia, the group telephoned Elijah Jackson. In an attempt to find out where he was, they told Jackson that they wanted to buy drugs from him. When Jackson indicated that he was not interested, appellant, Johnson, Jennings, Ms. Johns, and an unidentified fifth Blood set out in Jennings's car to try to find him. Appellant decided that Lamont Johnson would carry the gun because, as appellant put it, Johnson knew "how to handle a shotgun."

After driving around Columbia for approximately thirty minutes, the group spotted Elijah Jackson, in a car, with two other people. When that car pulled into a parking lot, Jennings followed and parked nearby. At that point, appellant instructed Ms. Johns to approach the vehicle and "distract" its occupants by asking to use a cell phone. As directed, Ms. Johns walked to the parked vehicle. As she approached the passenger's side of the car, Batts was in the driver's seat, Elijah Jackson was in the front passenger's seat, and Jackson's sister was seated behind him.

While Ms. Johns was speaking to the occupants of Batts's car, Lamont Johnson and appellant approached, walking to opposite sides of the vehicle. Pointing the shotgun at Elijah

---

2. An "OG," it was explained at trial, is an "Original Gangster," which is the second-highest ranking within the Bloods.

Jackson, through the car's open window, Johnson said, "You know what time it is." Then, after telling Elijah Jackson not to "f'ing move," Johnson fired the shotgun, twice, through the car window. Missing Jackson, one of the two blasts struck Batts in the back, severing his spinal cord.

Ms. Johns, Lamont Johnson, and appellant then ran back to Kevin Jennings's car, and the group fled in that vehicle. As they drove away, appellant rebuked Johnson, as he would again later that evening, for shooting before they could extract any money from the occupants of Batts's car.

When the group returned to the apartment in Columbia, appellant instructed the others not to tell anyone what had happened. Expecting a lot of police activity in response to the shooting, he added that he, Johns, Johnson, and Jennings would "wait it out" at the apartment before driving back to Baltimore.

When police arrived, at the location of the shooting, they found Batts dead and Elijah Jackson and his sister "close to . . . hysterical." Eventually, their investigation into the shooting led them to appellant, and, on July 2, 2008, they arrested him.

Although charged with one count of first-degree murder, among numerous other counts related to the weapon and attempted robbery, a jury found appellant guilty only of conspiracy to commit armed robbery, the attempted armed robbery of Elijah Jackson, and each of the three weapons counts, that is, possession of a regulated firearm by a person previously convicted of a crime of violence, possession of a regulated firearm by a person under age 21, and possession of a short-barreled shotgun. The circuit court thereafter sentenced him to fourteen years' imprisonment for attempted armed robbery, fourteen years' imprisonment for conspiracy to commit armed robbery, and five years' imprisonment for each of the weapons offenses. Each sentence was to be served consecutively, for a total sentence of forty-three years.

## Discussion

### I.

Appellant contends that the circuit court erred in denying his motion to suppress the statement he made during his custodial interrogation by police. Insisting that he made two "requests" for an attorney at the outset of his interrogation, he maintains that the police ignored both requests and then interrogated him for nearly three hours.

At a hearing on appellant's suppression motion, the circuit court heard testimony from the interviewing officers and from appellant and watched a video recording of the interview. The court then rejected appellant's claim, finding that he had not invoked his right to counsel until three hours into the interview; at which point, the officers ended their interrogation. Concluding that he had, therefore, waived his *Miranda* rights, the court denied his motion to suppress.

In reviewing the denial of a motion to suppress, we consider "only those relevant facts produced at the suppression hearing that are most favorable to the State as the prevailing party on the motion." *Wengert v. State,* 364 Md. 76, 84, 771 A.2d 389 (2001). While we accept the factual findings of the trial court, unless those findings are clearly erroneous, we "make our own independent constitutional appraisal as to whether an action was proper by reviewing the law and applying it to the facts of the case." *Billups v. State,* 135 Md.App. 345, 351, 762 A.2d 609 (2000) (citation and internal quotation marks omitted).

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court put into place "'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" *Lee v. State,* 418 Md. 136, 149, 12 A.3d 1238 (2011) (quoting *Florida v. Powell,* 559 U.S. ——, 130 S.Ct. 1195, 1203, 175 L.Ed.2d 1009 (2010)) (internal quotation marks omitted). If a suspect knowingly and intelligently waives his

right to counsel during a custodial interrogation, "law enforcement officers are free to question him." *Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (citing *North Carolina v. Butler*, 441 U.S. 369, 372–76, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)). "But, if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)).

In *Davis*, the Supreme Court considered whether a suspect had invoked his right to counsel when, in the course of a custodial interrogation and after waiving his *Miranda* rights, he stated, "Maybe I should talk to a lawyer." 512 U.S. at 455, 114 S.Ct. 2350. Although the interviewing agents inquired as to what Davis meant, they did not cease the interrogation at that point. *Id.* The subsequent statements made by Davis were, thereafter, admitted into evidence at trial, after Davis's motion to suppress them was denied. *Id.*

In holding that Davis had not invoked his right to counsel before giving the statements at issue and that, therefore, the statements were admissible, the Supreme Court promulgated the standard to be applied in determining whether such an invocation has been made:

Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

Rather, the suspect must unambiguously request counsel. . . . [He] must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

512 U.S. at 459, 114 S.Ct. 2350 (emphasis in original) (citations and internal quotation marks omitted).

The inquiry as to whether a suspect has actually invoked his right to counsel, the Court stressed, is an "objective" one. *Id.* And, in the absence of a clear statement invoking the right to counsel, the police are not required to ask "clarifying questions" as to the suspect's intended meaning. *Id.* at 461, 114 S.Ct. 2350.[3]

But, as *Davis* only involved an ambiguous invocation by a suspect of his right to counsel, **after** he had waived his *Miranda* rights, the Court did not address whether the same standard would, likewise, apply to an ambiguous invocation of the right to counsel **before** such a waiver had occurred. Later, in *Braboy v. State,* 130 Md.App. 220, 234–35, 745 A.2d 471 (2000), where the issue was whether Braboy had invoked his right to counsel before executing a waiver of his *Miranda* rights, we applied the *Davis* standard and concluded that, because Braboy had not "unequivocally and 'unambiguously' " requested counsel, he had not effectively invoked his right to counsel. We did not address the question of whether the *Davis* standard would apply to a pre-waiver invocation of counsel.

But we did address that issue, four years later, in *Freeman v. State,* 158 Md.App. 402, 424–29, 857 A.2d 557 (2004). In that case, Freeman went, on her own, to a police station and spontaneously admitted to having shot someone. *Id.* at 408–09, 857 A.2d 557. When an officer advised her of her *Miranda* rights and asked if she wished to waive them, Freeman said nothing. *Id.* at 409, 857 A.2d 557. Shortly thereafter, the officer asked Freeman "what happened," and she replied that she "[didn't] want to talk about it right now." *Id.* Only

---

**3.** Although the *Davis* Court "decline[d] to adopt a rule requiring officers to ask clarifying questions," it noted that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." 512 U.S. at 461, 114 S.Ct. 2350.

later did Freeman execute a waiver of her *Miranda* rights. *Id.* at 411, 857 A.2d 557.

On appeal, after looking at how other jurisdictions had decided the issue of the applicability of the *Davis* post-waiver standard to a pre-waiver purported invocation of rights,[4] we concluded that the *Davis* standard, "requiring an unequivocal assertion of the right to counsel," applied only in a "situation in which the defendant had previously waived his right and then, during the interrogation, arguably sought to exercise his rights." *Id.* at 429, 857 A.2d 557. We therefore declined to apply the *Davis* standard when, as in *Freeman*, the invocation "occurred in a pre-waiver context." *Id.*[5]

Consequently, we held that Freeman's *pre*-waiver silence, though arguably ambiguous, was nonetheless an invocation of the right to remain silent and that, although the police "could have sought to clarify whether [the suspect] intended her silence as an invocation of her rights, with questions limited to the effort to clarify," they "should not have ignored [her] silence" and continued the interrogation. *Freeman*, 158 Md. App. at 433, 857 A.2d 557.[6] Thus, in attempting to provide guidance, in the absence of any clear indication from the Supreme Court as to *Davis's* reach, we stated, in *Freeman*, that the *Davis* post-waiver standard, requiring an unambiguous invocation of a right, was inapplicable in the context of

---

**4.** In *Freeman*, 158 Md.App. at 428–29, 857 A.2d 557, we cited *State v. Leyva*, 951 P.2d 738, 745 (Utah 1997), where the Utah Supreme Court declined to apply the *Davis* post-waiver standard to an ambiguous pre-waiver invocation, and *State v. Tuttle*, 650 N.W.2d 20, 28 (S.D.2002), where South Dakota's highest court applied *Leyva's* reasoning and did the same.

**5.** Although *Freeman* involved the right to silence, rather than the right to counsel, the Supreme Court has held that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *See Berghuis v. Thompkins*, 560 U.S. ——, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010).

**6.** We ultimately concluded, however, that the admission of the suspect's statements, though error, was harmless. *Freeman*, 158 Md.App. at 434, 857 A.2d 557.

*pre*-waiver invocation of rights and that, when a suspect ambiguously invokes a *Miranda* right before actually waiving those rights, the police may do no more than ask clarifying questions. 158 Md.App. at 424–25, 433, 857 A.2d 557.

In 2010, however, the Supreme Court decided *Berghuis v. Thompkins,* 560 U.S. ——, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010), which, it appears, calls the conclusions we reached in *Freeman* into question. In *Berghuis,*[7] the Supreme Court applied the *Davis* standard, requiring an unambiguous post-waiver invocation of a *Miranda* right, to a pre-waiver invocation. In that case, the police brought Thompkins, a murder suspect, to the police station and presented him with a *Miranda* waiver form, which he declined to sign. 130 S.Ct. at 2256. Thereafter, the police interrogated Thompkins. Although he remained "[l]argely silent" for nearly three hours, he answered "yes" when an officer asked him whether he prayed "to God to forgive [him] for shooting that boy down." *Id.* at 2256–57. That response, Thompkins maintained, was obtained in violation of his *Miranda* rights.

Applying *Davis,* the Supreme Court concluded that Thompkins's "persistent silence" was an ineffective invocation of his right to remain silent, because it was not an unambiguous invocation of that right. *Id.* at 2258–60. In so holding, the Court, for the first time, applied the *Davis* standard, requiring an unambiguous invocation of a *Miranda* right, to a *pre*-waiver situation.

Although the Supreme Court, in the *Berghuis* majority opinion, did not expressly acknowledge its extension of the *Davis* standard, a dissenting opinion by Justice Sonia Sotomayor, joined by Justices John Paul Stevens, Ruth Bader Ginsburg, and Stephen G. Breyer, did:

> [T]he suspect's equivocal reference to a lawyer in *Davis* occurred only *after* he had given express oral and written waivers of his rights. *Davis'* holding is explicitly predicated

---

7. Although Thompkins was the respondent in the Supreme Court, we use his name to identify the case because he was the defendant in the underlying criminal action.

on that fact. [*See* 512 U.S. at 461, 114 S.Ct. 2350.] ("We therefore hold that, after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney."). The Court ignores this aspect of *Davis*, as well as the decisions of numerous federal and state courts declining to apply a clear-statement rule when a suspect has not previously given an express waiver of rights.

*Id.* at 2275 (Sotomayor, J., dissenting) (emphasis in original) (parallel citation and footnote omitted).[8]

There is no dispute that appellant's interview with police was a custodial interrogation, requiring *Miranda* warnings, which were, in fact, given. But there is disagreement as to whether appellant, *before* executing a written waiver of his *Miranda* rights, did, in fact, invoke his right to counsel. Arguing that he did invoke that right, appellant directs our attention to two references to a lawyer that he made before he executed the *Miranda* waiver.

The first of appellant's references—"What about my lawyer?"—was made approximately twenty seconds into the interview. The second—"can I get a lawyer?"—was made several minutes later, while the detectives were explaining appellant's *Miranda* rights to him and before they asked any questions about the shooting. We shall discuss those purported invocations chronologically, as the temporal progression of appel-

---

**8.** Thus, it appears that our holding in *Freeman*—that, in the pre-waiver context, the *Davis* standard is inapplicable and the police, when presented with an ambiguous invocation of a *Miranda* right, may do no more than ask clarifying questions—is no longer viable, an observation that is shared by at least one treatise:

> The recent decision of the Supreme Court in *Berghuis v. Thompkins* might indicate ... that a pre-waiver ambiguous invocation of the right to an attorney does not require officers just to clarify the equivocal invocation and does not prevent them from continuing to question a suspect. After *Thompkins,* those distinctions made in *Freeman* and in other cases ... might be called in question.

Andrew V. Jezic, Frank Molony, William E. Nolan, & Hon. Patrick L. Woodward, *Maryland Law of Confessions* § 12.2 (2010–2011 Ed.).

lant's references to legal representation provides a helpful context for our analysis.

After his arrest, appellant was interviewed at the Howard County police station by Detectives Aaron Dombrowsky and Joseph King. At the outset of the interview, Detective King, before he was joined in the interview room by Detective Dombrowsky, began by providing appellant with background on the *Miranda* warnings that were to come:

> [DETECTIVE KING]: What we're gonna do, even though, um, because you're technically in our custody right now, we gotta read you a couple of forms to go through. And then once we get past those forms.
>
> [APPELLANT]: *What about my lawyer?*
>
> [DETECTIVE KING]: We're dealing with everybody. We'll be able to talk to you, answer any questions. Because I can't really answer any of your questions until we go over that form. So, so you could have a hundred questions for me right now, and I really can't, and I'm willing to answer them, but until we go over that form, I can't. I know you were saying, that you were saying that, you know, this was all about a murder.
>
> [APPELLANT]: That that that's what the papers said.

(Emphasis supplied.)

At the conclusion of the suppression hearing, after watching a DVD of the interview and hearing testimony from appellant and both detectives, the circuit court began its analysis by explaining why appellant's first reference—"What about my lawyer?"—was not an unambiguous invocation of his right to counsel:

> With regard to the first page [of the transcript], Defendant says, "What about my lawyer?" To me, that's tantamount to, you know, maybe a lawyer; can I have a lawyer; do I get a lawyer. And what the officers [sic] are saying are [sic], "Let me read you these rights. I'm obliged to read you these rights." I don't find that to be an unequivocal statement that "I want a lawyer here. I'm not talking to you ... until you get me my lawyer."

In reviewing appellant's claim, we find instructive the Court of Appeals's recent opinion in *Ballard v. State,* 420 Md. 480, 491–93, 24 A.3d 96 (2011). There, the Court of Appeals contrasted a statement made by Ballard to an interrogating officer—"You mind if I not say no more and just talk to an attorney about this"—with statements in three cases in which the reviewing court had concluded that the suspect's statement was ambiguous: *Davis,* 512 U.S. at 462, 114 S.Ct. 2350 ("Maybe I should talk to a lawyer."); *Minehan v. State,* 147 Md.App. 432, 444, 809 A.2d 66 (2002); ("Should I get a lawyer?"); and *Matthews v. State,* 106 Md.App. 725, 738, 666 A.2d 912 (1995) ("Where's my lawyer?"). In the latter case, "[w]hen Matthews asked 'Where's my lawyer?' a reasonable officer," the *Ballard* Court observed, "could and likely would infer either that Matthews was wondering about his lawyer's whereabouts or, perhaps, whether a lawyer had been provided for him." 420 Md. at 492, 24 A.3d 96. Ballard's statement, in contrast, "transmit[ted] the unambiguous and unequivocal message that he wanted an attorney" because his phrasing "express[ed] a desire … to … have something occur." *Id.*

 When appellant asked, at the outset of the interview, "What about my lawyer?" a reasonable police officer could infer, as in *Matthews,* that appellant was "wondering about his lawyer's whereabouts or, perhaps, whether a lawyer had been provided for him." *Ballard,* 420 Md. at 492, 24 A.3d 96 (citing *Matthews* ). In other words, his statement was not, as in *Ballard,* an "unambiguous and unequivocal message that he wanted an attorney." *Id.* Hence, Detective King was not required to end the interrogation. *See Davis,* 512 U.S. at 459, 114 S.Ct. 2350. Nor was he limited to asking clarifying questions to ascertain appellant's intended meaning. *Id.* at 461, 114 S.Ct. 2350.

But, even if Detective King could do no more than ask clarifying questions, that is, even if we were to apply the stricter *Freeman* rule to appellant's ambiguous pre-waiver reference to a lawyer, the transcript makes clear that the detectives' questions and statements, after appellant inquired,

"What about my lawyer?" did no more than assist appellant in understanding his *Miranda* rights. That is, the detectives asked questions, in the words of *Freeman,* "limited to the effort to clarify":

[DETECTIVE DOMBROWSKY]: ... Did Detective King kind of tell you about ... [w]hat we have to cause you're here with us?

[APPELLANT]: Yeah he said a little bit. I'm not understanding.

[DETECTIVE DOMBROWSKY]: Okay.... Because you're in our custody? You have to be given what's called *Miranda* rights.

[APPELLANT]: Oh, I know, I, I'm, I've read them rights. And them, uh, that means I waive my rights to talk.

[DETECTIVE DOMBROWSKY]: No, it's just saying I got to read them to you....

 * * *

[DETECTIVE DOMBROWSKY]: For us to talk you have to say you want to talk to us, but at any time you can stop talking. Does that make sense?

[DETECTIVE KING]: Or if we ask you questions, you can say, I, I really don't want to answer that question.

Then, after the detectives read the *Miranda* warnings aloud, appellant made his second reference to a lawyer:

[DETECTIVE DOMBROWSKY]: ... Do you understand the rights that, that I read off to you? Do you understand what they mean?

[APPELLANT]: Yeah. Basically.

[DETECTIVE DOMBROWSKY]: Okay.

[APPELLANT]: That's what I was saying. I don't, ***can I get a lawyer?*** Cause.

[DETECTIVE DOMBROWSKY]: It's always your option. I mean, it, if you ask for a lawyer we're not going to talk.

[APPELLANT]: Right, but if I don't then I'm gonna incriminate myself. Which I ain't do nothing but.

[DETECTIVE DOMBROWSKY]: Like I said, these are your constitutional rights. You have the right to all these if you wish. If you don't waive these rights and agree to talk to us? Then our conversation today is over and done with. So it's gonna be up to you whether you want to talk to us or not talk to us.

[APPELLANT]: What did, all right, listen. All right, but.

\* \* \*

[DETECTIVE DOMBROWSKY]: ... If you're not willing to talk to me about that then you're not willing to talk to me about that.... But if you don't want to it's your ... constitutional right. But for, in order for you to be entertaining us with your questions, it has to be waived. There has to be some kind of waiver of your rights in order to talk with us. Does that make sense?

\* \* \*

[APPELLANT]: So if I waive my rights, then.

[DETECTIVE KING]: That mean [sic], if, to simplify it. If you waive your rights right now and you circle that form that says yes, I'm willing to talk. Yes, I'm willing to answer questions, and I understand these rights, and you do that. At that point we sit right here and we continue to talk. You ask us questions, we ask you questions....

[APPELLANT]: That means I got to answer.

[DETECTIVE DOMBROWSKY]: And if there's, if there's a point, no. No.

\* \* \*

[DETECTIVE DOMBROWSKY]: ... At any time if you don't want to talk to us and we ask you questions that you don't like and don't want to answer? You don't have to answer them. At any time during the interview you want to stop, you can stop.

\* \* \*

[APPELLANT]: Okay. Where do I sign at?

[DETECTIVE DOMBROWSKY]: You sign on, the bottom right hand corner. Like I said, I'm not trying to push you either way. . . .

[APPELLANT]: I unders. [sic] Look, I ain't.

*　　*　　*

[DETECTIVE DOMBROWSKY]: All right? We're straight?

[APPELLANT]: Yeah, we good.

[DETECTIVE DOMBROWSKY]: Does it make sense?

[APPELLANT]: Yeah, I'm just making sure I notice everything.

(Emphasis supplied.)

■ We agree with the circuit court's finding that, here, appellant did not make an unequivocal statement expressing a desire to have a lawyer present. Rather, a reasonable inference could be drawn that appellant was inquiring further as to the meaning of specific *Miranda* warnings as each was being explained. He was not, as in *Ballard*, "transmit[ting] the unambiguous and unequivocal message that he wanted an attorney." *See Ballard*, 420 Md. at 492. If appellant's comment indicated that he *might* want a lawyer provided, that was not enough, under *Davis*, to require the detectives to end the interview.

As they did with respect to appellant's first reference to a lawyer, the detectives responded by simply clarifying what appellant meant and reiterating that it was "always [his] option" to have a lawyer present and that he could stop the interview by "ask[ing] for a lawyer." Appellant responded by acknowledging that he understood those options. And, after having his *Miranda* rights carefully explained (and, indeed, having his misunderstanding, that he was required to answer every question, corrected), appellant waived those rights. Only then did the detectives ask questions that pertained to the attempted robbery and shooting. Thus, there was no constitutional violation even if we were to apply the *Freeman* rule limiting the detectives to clarifying questions only.

Then, more than three hours into the interview, appellant made an unambiguous request for an attorney:

[APPELLANT]: Why why why . . . you keep . . . *I'm not gonna talk no more. Where my lawyer at? Can I get a lawyer? Can I call my lawyer?* Now you you can't deny me, I just want you to deny me that.

[DETECTIVE DOMBROWSKY]: You can do whatever you wanna do.

[APPELLANT]: *You all can't talk to me no more because I've asked for my lawyer.*

[DETECTIVE DOMBROWSKY]: If that's what you're doing. Is that what you want?

[APPELLANT]: *(Nodding head).*

(Emphasis supplied.)

Presented with what was an unambiguous invocation of the right to counsel, the detectives discontinued the interview. Before that point, however, they were not required to do so. Consequently, the circuit court did not err in denying appellant's motion to suppress the statements that he made during his custodial interrogation.

## II.

■ Appellant contends that the circuit court erred in permitting the State to present evidence of his gang affiliation because there was "no real connection" between that affiliation and the charged offenses. But, because, as the State observes, appellant did not object when that evidence was introduced at trial, he has failed to preserve this issue for our review, even though he had, earlier, moved to exclude that evidence.

■ "It is well established that a party opposing the admission of evidence 'shall' object 'at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived.'" *Ware v. State*, 170 Md.App. 1, 19–20, 906 A.2d 969 (2006) (quoting Md. Rule 4–323(a)) (additional citations omitted); *see also* Md.

Rule 5–103(a) ("Error may not be predicated upon a ruling that admits ... evidence unless the party is prejudiced by the ruling, and ... a timely objection or motion to strike appears of record. . . ."). Moreover, "objections must be reasserted unless an objection is made to a continuing line of questions." *Ware*, 170 Md.App. at 19, 906 A.2d 969 (citing *Brown v. State*, 90 Md.App. 220, 225, 600 A.2d 1126 (1992)). That is, to preserve an objection, a party must either "object each time a question concerning the [matter is] posed or ... request a continuing objection to the entire line of questioning." *Brown*, 90 Md.App. at 225, 600 A.2d 1126.

The requirement of a contemporaneous objection at trial applies even when the party contesting the evidence has made his or her objection known in a motion in limine:

"Whether the motion in limine is made before trial or during trial, a court's ruling which has the effect of admitting contested evidence does not relieve the party, as to whom the ruling is adverse, of the obligation of objecting when the evidence is actually offered. Failure to object results in the non-preservation of the issue for appellate review."

*Reed v. State*, 353 Md. 628, 637, 728 A.2d 195 (quoting *Hickman v. State*, 76 Md.App. 111, 117, 543 A.2d 870 (1988)).

Here, appellant moved, in a pre-trial motion in limine, to exclude evidence of his gang affiliation. After a hearing, the circuit court denied the motion, concluding that there was "overwhelming" evidence that appellant was a member of the Bloods gang and that his membership was relevant to the case: "[Appellant is] loyal to his Blood family members, so much so that he would go to Columbia to take care of business for another Blood member."

Then, at trial, although appellant objected to certain statements by several witnesses with respect to his gang affiliation, he failed to object to other testimony relating to that affiliation. Since he did not request a continuing objection to the gang affiliation testimony, his objection was waived. *See*

*Ware,* 170 Md.App. at 19–20, 906 A.2d 969; *Brown,* 90 Md. App. at 225, 600 A.2d 1126.

 But, even if the issue were preserved for our review, we would have no trouble concluding that it is without merit. Under Maryland Rule 5–404(b), evidence of "other crimes, wrongs, or acts," is not admissible to "prove the character of a person in order to show action in conformity therewith." But, such evidence is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." Md. Rule 5–404(b). Evidence of gang membership falls within the definition of "other crimes, wrongs, or acts" in Rule 5–404(b). *Ayala v. State,* 174 Md.App. 647, 658, 923 A.2d 952 (2007).

The Court of Appeals has explained that, for evidence to be admissible under the motive exception in Rule 5–404(b), "the prior conduct must be committed within such time, or show such relationship to the main charge, as to make [the] connection obvious." *Snyder v. State,* 361 Md. 580, 605, 762 A.2d 125 (2000) (citations and internal quotation marks omitted). The evidence at the motions hearing established (1) that appellant was in a leadership role in the Bloods; (2) that McConnell, a fellow member of the Bloods who lived in Columbia, was concerned that Jackson was giving information to the police about him; (3) that McConnell was Johnson's cousin; (4) that Johnson and appellant were associates, being in the same "set" of the Bloods in Baltimore; (5) that appellant went to Columbia to assist Johnson because "there was business to be taken care of," specifically, that "someone [was] snitching"; (6) that appellant met McConnell in Columbia; (7) that appellant and others drove around Columbia to locate the "snitch"; and (8) that Jackson, and not Batts, was the intended target of the attempted robbery and murder.

 As the circuit court recognized in denying appellant's motion, the evidence established a motive for the crime, specifically that appellant, "loyal to his Blood family members," went from Baltimore to Columbia "to take care of

business for another Blood member." Thus, contrary to appellant's contention, the circuit court did not err in concluding that the evidence of appellant's gang affiliation fit within the "motive" exception of Rule 5–404(b).

## III.

Appellant contends that the circuit court erred in "instructing the jury that there was a stipulation that [he] ha[d] a prior conviction for a crime of violence that would prohibit him from being in possession of a regulated firearm." Specifically, appellant asserts that, under *Carter v. State*, 374 Md. 693, 722, 824 A.2d 123 (2003), the court should not have used the term "crime of violence," when informing the jury of the stipulation, but should have simply informed the jury that he had been convicted of a crime for which he was prohibited from possessing a regulated firearm.

Appellant has also failed to preserve this issue for our review. Maryland Rule 4–325(e) provides: "No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." "Ordinarily, the appellate court will not decide any ... issue [other than jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court...." Md. Rule 8–131(a).

When the State informed the circuit court of the stipulation, and the circuit court said that the stipulation would be included in the jury instructions, appellant did not object. Nor did he object when the court read the stipulation to the jury, or when the term "crime of violence" was used at a different point in the jury instructions, or when it was included on the verdict sheet. Hence, appellant did not preserve this issue for our review.

But that does not end our discussion. At the risk of beating a dead horse, we further note that, just as significant

as appellant's failure to object is the fact that he invited the error he now complains of by requesting that the "crime-of-violence" language be included in the jury instructions. The "invited error" doctrine, the Court of Appeals has explained, operates to prevent a windfall when the error complained of on appeal was caused by the complaining party:

> The "invited error" doctrine is a shorthand term for the concept that a defendant who himself invites or creates error cannot obtain a benefit—mistrial or reversal—from that error. The doctrine stems from the common sense view that where a party invites the trial court to commit error, he cannot later cry foul on appeal.
>
> The doctrine is applicable to appellate review of jury instructions specifically requested by the criminal defendant's counsel.

*State v. Rich*, 415 Md. 567, 575, 3 A.3d 1210 (2010) (citations and internal quotation marks omitted).

In two different sets of proposed jury instructions, appellant requested that the jury be instructed as follows:

> The Defendant is charged with Possession of [a] Regulated Firearm by a Person Convicted of a *Crime of Violence.* In order to be convicted, the State must prove beyond a reasonable doubt that on or about May 17, 2008,[9] the Defendant was in possession of a regulated firearm and was previously convicted of a *crime of violence.*

(Emphasis supplied.)

As requested, the circuit court instructed the jury, using the term "crime of violence." Having made those requests, appellant "cannot [now] cry foul on appeal." *See Rich*, 415 Md. at 575, 3 A.3d 1210; *see also Nash v. State*, 191 Md.App. 386, 402–03, 991 A.2d 831, *cert. denied*, 415 Md. 42, 997 A.2d 792 (2010) (denying relief where the defendant invited the complained of error by requesting a "bifurcation of the elements of the offense").

---

**9.** One set of appellant's proposed jury instructions included the date of the offense, and the other did not. They were otherwise identical.

██ Appellant also claims that his trial counsel was constitutionally ineffective for stipulating that he had a prior conviction of a "crime of violence" and for failing to object when that stipulation was included in the jury instructions. It is well established that "a claim of ineffective assistance of counsel should be raised in a post-conviction proceeding, subject to a few exceptions." *Robinson v. State,* 404 Md. 208, 219, 946 A.2d 456 (2008). This rule exists because "ordinarily, the trial record does not illuminate the basis for the challenged acts or omissions of counsel." *In re Parris W.,* 363 Md. 717, 726, 770 A.2d 202 (2001). That is the case here, where we do not know the reasons that appellant's counsel may have had for requesting the instructions that he did. Consequently, the issue of ineffectiveness, with respect to this matter, is "best left for exploration in post-conviction and collateral fact-finding proceedings." *See Robinson,* 404 Md. at 219, 946 A.2d 456.

## IV.

Appellant contends that the circuit court erred in "propounding questions during the voir dire process which linked the question whether the [prospective juror] could be fair and impartial with the [prospective juror's] status or experience." Appellant claims that these questions were impermissible, because they "improperly allowed" the prospective juror "to decide his or her own bias."

This issue was also not preserved for our review. No objection to these questions was made in the circuit court.

Objections to rulings in jury selection are governed by Maryland Rule 4–323(c), which provides:

For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court. The grounds for the objection need not be stated unless these rules expressly provide otherwise or the court so directs. If a party has no opportunity to object to a ruling or order at the time it is

made, the absence of an objection at that time does not constitute a waiver of the objection.

*See Baker v. State,* 157 Md.App. 600, 610, 853 A.2d 796 (2004).

■■■ Because appellant failed to "make[ ] known to the court the action [he] desire[d] the court to take or the objection to the action of the court," he waived his objection to the contested questions. *See* Md. Rule 4–323(c); Md. Rule 8–131(a).

In any event, the issue has no merit. Appellant's claim is based on *Dingle v. State,* 361 Md. 1, 759 A.2d 819 (2000), where the Court of Appeals disapproved of compound voir dire questions that asked the prospective juror whether he or she had had certain experiences or associations, and, if so, whether the experience or association "would affect [his or her] ability to be fair and impartial." 361 Md. at 3–4, 759 A.2d 819. The court below had instructed the jury that, only if the prospective juror answered both questions affirmatively, was he or she to inform the court. *Id.* The flaw in that procedure, the Court of Appeals explained, was that it shifted the responsibility to decide whether bias existed from the trial court to the prospective juror:

> [The] process ... allows, if not requires, the individual venire[ ]person to decide his or her ability to be fair and impartial.... [W]here the venire[ ]person has had the questioned experience or association, but believes he or she can be fair, the procedure followed in this case shifts from the trial judge to the venire responsibility to decide juror bias. Without information bearing on the relevant experiences or associations of the affected individual venire[ ]persons who were not required to respond, the court simply does not have the ability, and, therefore, is unable to evaluate whether such persons are capable of conducting themselves impartially.

*Id.* at 21, 759 A.2d 819.

But, two years after *Dingle,* the Court of Appeals opined that not all compound questions are impermissible. In *State*

*v. Thomas,* 369 Md. 202, 204, 798 A.2d 566 (2002), the Court considered the following proposed voir dire question:

> "Does any member of the jury panel have such strong feelings regarding violations of the narcotics laws that it would be difficult for you to fairly and impartially weigh the facts at a trial where narcotics violations have been alleged?"

Although this Court concluded that the question was improper under *Dingle,* the Court of Appeals disagreed:

> When the inquiry is into the state of mind or attitude of the venire with regard to a particular crime or category of crimes, it is appropriate to phrase the question as was done in this case.

*Thomas,* 369 Md. at 205 n. 1, 798 A.2d 566.

Here, appellant complains about the following four questions:

> "Does any member of the panel have any pre-conceived notions about gangs or gang memberships which will prevent you from being fair and impartial in this case?

> "Does any member of the panel have any fixed opinions, biases or prejudices, about people of a particular race which would affect your ability to render a fair and impartial verdict in this case based solely on the law and the evidence?

> "Does any member of the panel have any particular feelings regarding the right to keep and bear arms which would make you unable to render a fair and impartial verdict?

> "Does any member of the panel have any prejudice or bias for or against the Defendant in this case which could affect your judgment as to his guilt or innocence?"

Unlike the impermissible questions in *Dingle,* these questions pertained, not to the prospective juror's experiences or associations, but to his "state of mind or attitude," about gangs, race, guns, and appellant, himself. The problem inherent in the *Dingle* questions, as noted, was that those questions

allowed a prospective juror, who had had a particular experience or association that might prejudice his views, to withhold that information from the court, thus impermissibly "shift[ing] from the trial judge to the venire responsibility to decide juror bias." *Dingle*, 361 Md. at 21, 759 A.2d 819.

In contrast, the questions at issue, here, asked prospective jurors specifically whether they had any disqualifying biases and highlighted four areas in which such a bias might be present: gangs, race, the right to gun ownership, and appellant, himself. An affirmative answer to one of the questions meant that the prospective juror could not be impartial. Consequently, the prospective juror was not, as in *Dingle*, withholding information that the court required to make its own independent determination of the prospective juror's ability to be impartial. *Id.*

Like the question in *Thomas*, which addressed the prospective juror's "state of mind or attitude" with respect to a particular crime, these questions did not run afoul of *Dingle*. And, because the questions were permissible, appellant's assertion that his counsel was constitutionally ineffective for failing to object to them is without merit. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (To prevail on a claim of ineffective assistance of counsel, the defendant must first show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.").

## V.

Appellant claims that "the cumulative effect of . . . inadmissible and admissible prejudicial evidence denied [him] his right to a fair trial." Pointing, first, to a witness's reference to the fact that certain of appellant's associates, but not appellant himself, were drug dealers; second, to a set of documents introduced at trial that referred to criminal charges against Lamont Johnson; and, third, to his reference in a transcripted jail call to a prior felony conviction, appellant asserts that he is

entitled to reversal under *Carter v. State*, 366 Md. 574, 785 A.2d 348 (2001).

Appellant's reliance on *Carter* is misplaced. In that case, the Court of Appeals concluded that the circuit court had abused its discretion in denying the defendant's repeated motions for a mistrial after an improper remark by the prosecutor, two references by witnesses to the defendant's prior criminal conduct, and curative instructions that served to emphasize the errors. *Carter*, 366 Md. at 591, 785 A.2d 348. Here, in contrast, appellant made no request for a mistrial and no objection to the testimony about drug dealing. *Carter* is, therefore, inapplicable.

With respect to the reference to a prior felony conviction that was included in the transcript of a call he made from jail, the circuit court sustained appellant's objection and redacted that portion of the transcript to remove the offending reference. Thus, the only one of the alleged errors that has been preserved and that involves evidence actually admitted at trial is the admission of documents that included, among other things, a case history printout listing various charges against Lamont Johnson. Appellant does not claim, and we do not conclude, that the admission of that evidence, even if erroneous, deprived him of a fair trial.

Nor do we accept appellant's invitation to examine the constitutional effectiveness of his attorney in failing, when the contested evidence was introduced, to move for a mistrial. As the State points out, appellant's acquittal on the charges of felony murder of Batts and attempted robbery with a dangerous weapon of both Batts and Jackson's sister, suggests that the decision of appellant's attorney not to request a mistrial, in response to the admission of evidence of Johnson's criminality, may well have been a wise one. Here, once again, we cannot be sure of why counsel chose not to request a mistrial, and therefore counsel's reasons for that choice "are best left for exploration in post-conviction and collateral fact-finding proceedings." *See Robinson*, 404 Md. at 219, 946 A.2d 456.

## VI.

■ Appellant contends that the circuit court erred in failing to merge his three firearm convictions, citing both the required evidence test and the rule of lenity. Although appellant did not object to his convictions or sentence at trial, we may review, on direct appeal, a sentence that is "beyond the statutory power of the court to impose" even if no objection was made at the trial level. *See Moore v. State*, 163 Md.App. 305 313, 878 A.2d 678 (2005) (citing *Walczak v. State*, 302 Md. 422, 427, 488 A.2d 949 (1985); *Chilcoat v. State*, 155 Md.App. 394, 413 n. 4, 843 A.2d 240 (2004)).

Appellant was convicted of violating three different provisions of the Public Safety Article of the Maryland Code (2003): § 5–133(c)(1), which provides, in pertinent part, that "[a] person may not possess a regulated firearm [10] if the person was previously convicted of . . . a crime of violence"; § 5–133(d), which provides, in pertinent part, that "a person who is under the age of 21 years may not possess a regulated firearm"; and § 5–203(a), which provides, in pertinent part, that "[a] person may not possess a . . . short-barreled shotgun." Appellant received consecutive five-year sentences for each conviction, and the sentence for possession of a regulated firearm, after having been previously convicted of a crime of violence, was, as required by statute,[11] to be served without the possibility of parole.

We first note that appellant's contention with respect to his two convictions under § 5–133 (for possessing a firearm, while under the age of twenty-one, and possessing a firearm, after having been previously convicted of a crime of violence) requires a different legal analysis than does his contention with respect to the merger of his convictions under that section

10. The definition of "regulated firearm" will later be discussed more fully, but there is no dispute, on appeal, that the short-barreled shotgun used in Batts's murder was such a firearm or that appellant possessed it during the crime.

11. Subsection 5–133(c)(3) provides: "A person sentenced under paragraph (1) of this subsection may not be eligible for parole."

with his conviction under § 5–203 (for possessing a short-barreled shotgun). In fact, although appellant describes the former claim as implicating the doctrine of merger, we conclude that it involves, instead, a different issue, namely, a determination of the appropriate "unit of prosecution" for the offense. And that determination was made in *Melton v. State,* 379 Md. 471, 474, 842 A.2d 743 (2004).

Melton was convicted of three offenses under the statutory predecessor to § 5–133.[12] Each involved the illegal possession of the same regulated firearm. 379 Md. at 476, 842 A.2d 743. The three convictions were for possessing a regulated firearm, after having been convicted of, first, a crime of violence; second, a felony; and, third, a misdemeanor with a statutory penalty of more than two years. *Id.* Melton asserted that only one of his convictions could stand, and the Court of Appeals agreed. *Id.* at 474, 842 A.2d 743.

Looking to the legislative history of the statute, the Court held that the "illegal possession of a regulated firearm, not the prior conviction, was the vice sought to be remedied" by the statute. *Id.* at 484–86, 842 A.2d 743. In so holding, the Court also considered the language of § 5–133 of the Public Safety Article which, though not in effect at the time of Melton's crime, "provide[d] some insight into the Legislature's intent regarding [the] unit of prosecution" for its statutory predecessor. *Id.* at 498, 842 A.2d 743. The Court of Appeals observed that the "focus of the penalty [in § 5–133], *i.e.,* the 'violation' to be punished, is the act of possession." *Id.* at 502, 842 A.2d 743. Hence, the "unit of prosecution for [§ 5–133]" was "the prohibited act of illegal possession of a firearm," declared the Court, and only one of Melton's three convictions under the act could stand. *Id.* at 486, 503, 842 A.2d 743. In other words, "the statute d[id] not support multiple convictions

---

**12.** Prior to 2003, the provisions prohibiting and penalizing the possession of regulated firearms by certain individuals appeared in Article 27, §§ 445(d)(1) and 449(e) of the Maryland Code (1957, 1996 Repl.Vol., 2001 Supp.). Those provisions were recodified, without substantive change, as § 5–133 of the Public Safety Article. *Melton,* 379 Md. at 500, 842 A.2d 743; *see* "Special Revisor's Note" to § 5–133.

based on several prior qualifying offenses where there [wa]s only a single act of possession." *Id.* at 486, 842 A.2d 743.

Applying *Melton's* holding to the instant case, we conclude, and the State concedes, that when appellant possessed a single regulated firearm, which was illegal under § 5–133 for two reasons (his age and his prior conviction for a crime of violence), he committed only one violation of that section. As a result, only one of appellant's convictions under § 5–133 can stand. As the *Melton* Court did, we shall affirm the conviction for the offense with the greater penalty, that is, possession by a person previously convicted of a crime of violence, and reverse the conviction for the offense with the lesser penalty, that is, possession by a person under the age of twenty-one. *See Melton,* 379 Md. at 503, 842 A.2d 743.

But, with respect to appellant's contention that his conviction under § 5–133(c) should merge with his conviction under § 5–203, we apply a different analysis and reach a different conclusion. As discussed above, appellant's possession of a regulated firearm, while prohibited under two different subsections of § 5–133 (specifically subsections (c) and (d)), constituted only one violation under that law. Thus, he could receive only *one* conviction, a result with which the doctrine of merger, which involves the combination, for sentencing purposes, of *multiple* convictions, is unconcerned. In contrast, appellant's possession of a short-barreled shotgun violated two different statutes, namely, §§ 5–133 and 5–203, that is, illegal possession of a regulated firearm and possession of a short-barreled shotgun, respectively. For those two violations, appellant could, and did, receive two convictions.

In determining whether multiple convictions should merge, for sentencing purposes, for what is, in essence, the same act, we apply the required evidence test. *Dixon v. State,* 364 Md. 209, 236–37, 772 A.2d 283 (2001). The required evidence test focuses on the elements of each crime:

> If each offense requires proof of a fact which the other does not, the offenses are not the same and do not merge. However, if only one offense requires proof of a fact which

the other does not, the offenses are deemed the same, and separate sentences for each offense are prohibited.

*Id.* at 237, 772 A.2d 283 (citations omitted).

■ This determination is made by examining the "required evidence" for the offense, that is, the evidence "minimally necessary to secure a conviction" for the offense, *Dillsworth v. State,* 308 Md. 354, 357, 519 A.2d 1269 (1987) (citation omitted), not the "actual evidence" presented at trial, *Brooks v. State,* 284 Md. 416, 420, 397 A.2d 596 (1979).

■ Appellant's conviction, under § 5–133(c), for possessing a regulated firearm, after having been previously convicted of a crime of violence, does not merge under the required evidence test with his conviction, under § 5–203, for possessing a short-barreled shotgun, even though the two offenses involve the same act, because those offenses do not share all the same elements. A conviction under § 5–133(c) requires proof that a person possessed a regulated firearm and that he had previously been convicted of a crime of violence. A "regulated firearm" is a "handgun," or one of a list of "specific assault weapons or their copies." *See* § 5–101(p). A "handgun" is, under § 5–101(n) of the Public Safety Article, "a firearm with a barrel less than 16 inches in length."

A conviction under § 5–203, on the other hand, requires proof that a person possessed a short-barreled shotgun and that he did not fall into one of the limited exceptions that permit possession.[13] A short-barreled shotgun is either "a

---

13. Subsection (a)(1) of § 5–203 provides that the prohibition on the possession of a short-barreled shotgun does not apply if the person, "while on official business is: (i) a member of the law enforcement personnel of the federal government, the State, or a political subdivision of the State; (ii) a member of the armed forces of the United States or the National Guard while on duty or traveling to or from duty; (iii) a member of the law enforcement personnel of another state or a political subdivision of another state, while temporarily in this State; (iv) a warden or correctional officer of a correctional facility in the State; or (v) a sheriff or a temporary or full-time deputy sheriff." Subsection (a)(2) provides that the provision does not apply if the short-barreled shotgun "has been registered with the federal government in accor-

shotgun that has one or more barrels less than 18 inches long" or "a weapon that has an overall length of less than 26 inches long and was made from a shotgun, whether by modification or otherwise." *See* § 5–201(d) of the Public Safety Article; § 4–201(g) of the Criminal Law Article.

Thus, § 5–133(c) requires proof of a fact that § 5–203 does not, that is, a prior conviction for a crime of violence, and § 5–203 requires proof of a fact that § 5–133 does not, that is, that the gun possessed was a short-barreled shotgun. That the possession of the same gun supported both of appellant's convictions for those two offenses, does not, under the required evidence test, compel merger. *See Brooks*, 284 Md. at 420, 397 A.2d 596.

 That does not end our inquiry, however, because even where two offenses do not merge under the required evidence test, "there are nevertheless times when the offenses will not be punished separately":

> [W]hen we are uncertain whether the legislature intended one or more than one sentence . . . we make use of an aid to statutory interpretation known as the "rule of lenity." Under that rule, if we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we, in effect, give the defendant the benefit of the doubt and hold that the crimes do merge.

*Monoker v. State*, 321 Md. 214, 222, 582 A.2d 525 (1990).

 But the rule of lenity " 'serves only as an aid for resolving an ambiguity; it is not used to beget one.' " *Dillsworth v. State*, 308 Md. 354, 365, 519 A.2d 1269 (1987) (quoting *Albernaz v. United States*, 450 U.S. 333, 343, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981)). As a consequence, the rule "does not apply when there is no ambiguity to resolve." *Alston v. State*, 159 Md.App. 253, 271, 858 A.2d 1100 (2004), *cert. granted*, 390 Md. 500, 889 A.2d 418 (2006).

---

dance with federal law." Under subsection (b), the burden of proving such lawful registration is on the defendant.

There is no ambiguity with respect to the legislative intent underlying the statutes at issue in the instant case. As the Court of Appeals has noted, "[t]he General Assembly of Maryland has long been concerned with the unlawful use of handguns." *Frazier v. State*, 318 Md. 597, 599, 569 A.2d 684 (1990). As early as 1941, the Maryland Code included a proscription against the possession of a "pistol or revolver" by a person who had previously been convicted of a crime of violence. *See* 1941 Maryland Laws, Chapter 622, section 531E. Although the precise language in the statutory prohibition against the possession of such guns by persons who have shown themselves to be violent has changed over time, the policy is now reflected in § 5–133 of the Public Safety Article, under which appellant was prosecuted.

And, since at least 1976, the General Assembly has been particularly concerned with short-barreled shotguns and short-barreled rifles, weapons that, like pistols or revolvers, pose a unique threat because they may be easily concealed. In that year, the General Assembly enacted Article 27, § 481C, which is the statutory predecessor to § 5–203 of the Public Safety Article, under which appellant was prosecuted, thereby making it illegal, except for the narrow exceptions noted above, to possess a short-barreled shotgun or short-barreled rifle.

Thus, the offenses of possessing a regulated firearm, after having been previously convicted of a crime of violence, and possessing a short-barreled shotgun are directed at different legislative concerns. The former is directed at preventing certain persons, specifically those who have shown themselves to be violent, from possessing weapons that others may lawfully have. The latter is directed at preventing all people (or at least all members of the public) from possessing a certain type of uniquely dangerous weapon, regardless of criminal history. Hence, the legislative intent is clear, there is no ambiguity, and the rule of lenity does not apply. *See Alston*, 159 Md.App. at 271, 858 A.2d 1100.

CONVICTION AND SENTENCE FOR POSSESSION OF A REGULATED FIREARM BY A PERSON UNDER THE AGE OF TWENTY–ONE VACATED. ALL OTHER JUDGMENTS AFFIRMED. COSTS TO BE PAID ONE–HALF BY HOWARD COUNTY, ONE–HALF BY APPELLANT.